SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

GUILD FILMS COMPANY, Inc., Santa Monica Bank, Southwest Bank of Inglewood, and Hal Roach, Jr., Defendants.

United States District Court
S. D. New York.
Nov. 13, 1959.

Paul Windels, Jr., Regional Administrator, Securities and Exchange Commission, New York City, for plaintiff (John J. Devaney, Jr., William D. Moran and Arthur Goldman, New York City, of counsel).

Jacob Rapoport, New York City, for defendant Santa Monica Bank.

Joel Arnold, New York City, for defendant Southwest Bank of Inglewood.

Robert Kirtland, New York City, for defendant Hal Roach, Jr.

SYLVESTER J. RYAN, Chief Judge.

The Commission seeks to enjoin the defendants from selling and delivering, after sale, shares of the common stock of Guild Films Company, Inc., in violation of Section 5(a) of the Securities Act of 1933, 15 U.S.C.A. § 77e(a).

These shares of stock had been delivered in February, 1959, to the Santa Monica Bank by defendant Roach as purported collateral on a note in default and the sale was made by the Santa Monica Bank in payment of the loan. However, the Guild Film Company, Inc., refused to transfer the shares on its books and the Bank, in September, 1959, brought suit against it in the New York Supreme Court to compel such transfer. This suit terminated in a judgment entered on September 18, 1959, in the Bank's favor

directing the transfer on a determination by that Court that the stock was exempt from the registration provisions of the Act. The Santa Monica Bank following this judgment ordered the sale of some 9,500 shares. Upon learning of this sale, the Commission, which had not been a party to the State Court suit, notified the Bank, Guild Film and the transfer agent that the stock could not be sold without registration. Counsel for the Santa Monica Bank then requested an opinion from the Commission. But, despite an opinion from it that the stock was not exempt, the Santa Monica Bank proceeded to sell an additional 10,500 shares on September 24, 1959. It was then that the Commission filed this suit to restrain the delivery of these shares and the sale of the balance of the stock.

There appears to be no substantial dispute as to the events leading up to the sale.

On September 17, 1958, defendant Roach obtained a loan from the Santa Monica Bank and the Southwest Bank of Inglewood in the total sum of $120,000, represented by two separate notes, the Santa Monica Bank managing the loan for both banks. The first note, that to the Santa Monica Bank in the sum of $60,000, was dated September 17, 1958 and payable December 15, 1958; the second, that to the Southwest Bank of Inglewood also in the sum of $60,000 was dated September 25, 1958 and payable November 24, 1958.

At the time, Roach executed a collateral agreement and secured the loan by a deposit of stock as collateral with the Santa Monica Bank as follows:

On September 17, 1958, he deposited 34,475 shares of the Scranton Corp. and 2,000 shares of F. L. Jacobs Co. stock valued at $15½ and $8 respectively, with the understanding that the Scranton stock would be replaced by more Jacobs stock; on September 23, 1958, he deposited 8,500 shares of Jacobs stock; on September 25, 1958, he deposited another 6,500 shares—at which time Roach received the Southwest Bank advance;

on September 29, 1958, he exchanged the 34,475 shares of Scranton Corp. stock for 10,000 shares of the same corporation; and on October 10, 1958 by agreement these were replaced by 13,000 shares of Jacobs stock. So that as collateral for a loan of $120,000, the Bank held a total of 30,000 shares of Jacobs stock in a street name valued at $8 a share. The proceeds of the loan were deposited to a joint checking account in the name of Roach and Meacham, the treasurer of Hal Roach Studios which Roach owned, and which was a subsidiary of Scranton Corp. of which Roach was an officer and director. At the time of the making of the loan, the Bank relied on an unverified, undated personal financial statement submitted by Roach, which showed him to have a net worth of $797,750 and no outstanding debts. It was not until several weeks after the making of the loan that the Bank obtained Dun & Bradstreet reports on the Jacobs and Scranton companies in which Roach was a controlling stockholder. Although the Bank had never transacted any business with Roach before this, its officers knew him for many years and made no further investigation into his personal financial standing.

On December 9, 1958, the Bank learned that the Jacobs stock had been suspended from trading on the New York Stock Exchange. The Bank wrote to Roach asking him to liquidate the loan before December 15, 1958, as the suspended stock had dropped in value from $8 to $5 and was no longer acceptable collateral. Although the Southwest Bank note had matured on November 24, 1958, the entire loan was treated as due and payable on December 15, 1958, the maturity date of the note of the Santa Monica Bank. After several conversations with Roach, the Santa Monica Bank on December 18, 1958 wrote to Meacham informing him that it would renew Roach's note for an additional ninety days on the posting of additional collateral in the amount of 10,000 additional shares of the Jacobs Corp. or the equivalent number of shares of Scranton Corp.,

or on the payment of $30,000; on the understanding that Roach would do so, it enclosed a renewal note dated December 18, 1958 due March 18, 1959 in the amount of $60,000 for Roach's signature and requested payment of $775, the interest on the matured and past due note. On the same day, the Southwest Bank wrote to the effect that it was anxious to remove the past due note from the file prior to the end of the year and that it would renew its note on the payment of $699.97 interest and on the conditions agreed upon with the Santa Monica Bank, and enclosed a renewal note which bore the notation "Renewal—Secured by stocks held for our account by Santa Monica Bank". On December 19, 1958 Meacham returned the new notes executed by Roach and asked for time in which to decide with which of the alternate conditions imposed Roach would comply. Meacham also wrote that they assumed that a few days in which to make up their minds would not be disturbing to the Bank. Thereafter, although the Santa Monica Bank was in constant communication by phone with Roach and Meacham, no collateral was immediately posted or payment made on the principal past due amount. On December 31, 1958, the Southwest Bank wrote to Roach informing him that they would not negotiate the renewal note of December 18, 1958 until such time as he performed the conditions agreed on by him. Finally, on January 28, 1959, the Southwest Bank sent a letter to Roach demanding payment by February 3, 1959 of the note of November 24, 1958, which was now more than two months in default.

The Santa Monica Bank did not send a demand letter but it was in constant communication with Roach whom it was trying to help; he had requested them not to sell the Jacobs stock and promised to obtain for the Bank some Guild Film notes or stock if it gave him more time.

All this had been going on for more than a month. On February 3, 1959, Roach sent a telegram to the Santa Monica Bank informing it that he had deposited $75,000 Guild Film notes to the Santa Monica Bank account with the Chemical-Corn Exchange Bank in New York, which would be replaced by 50,000 shares of Guild Film stock at $2.50 per share. He stated that this was the best he could do until he returned to Los Angeles. The deposit of these 50,000 shares did not take place until February 12, 1959, at which time the Santa Monica Bank note was almost two months in default and the note of the Southwest Bank two and one-half months in default, with no principal payment whatsoever having been made.

The Guild Film stock deposited was represented by one certificate in the name of Rabco T. V. Productions, Inc., dated February 5, 1959; on its face at the very top of the certificate, it bore the following legend:

"The shares represented by this certificate have not been registered under the Securities Act of 1933. The shares have been acquired for investment and may not be sold, transferred, pledged or hypothecated in the absence of an effective registration statement for the shares under the Securities Act of 1933 or an opinion of counsel to the company that registration is not required under said Act."

It was accompanied by a stock power executed by an officer of Rabco dated February 20, 1959, but no copy of a resolution authorizing the execution of the power was attached. The Santa Monica Bank never inquired as to this, although it was customary to require such evidence of authority. At the time it received this stock certificate, it directed the release of the notes of Guild Film which Roach had deposited with the Chemical-Corn Exchange Bank, which Santa Monica Bank had never seen or investigated.

The notes and stock of Guild Films had been acquired by Roach under an agreement made on January 23, 1959 between W-R Corporation (a wholly owned subsidiary of Roach) and Guild Films, under which Guild Films conveyed 400,-000 shares of its common stock and sev-

eral promissory notes to W-R in exchange for certain film rights; performance by W-R was guaranteed by Roach Studios.

In paragraph 4 of this agreement, Guild agreed to use its best efforts to cause the 400,000 shares of common stock issued pursuant to the agreement to be duly registered under the Securities Act of 1933 as promptly as possible. However, in order to obtain the exemption of a private offering under Sec. 4(1) of the Act, it was provided in paragraph 5:

"Stock Taken for Investment: W-R warrants, represents and agrees that all of the said 400,000 shares of Guild's common stock being contemporaneously issued hereunder, whether registered in the name of W-R or in accordance with the instructions of W-R, are being acquired for investment only and not for the purpose or with the intention of distributing or reselling the same to others. Guild is relying on said warranty and representation in the issuance of said stock."

On February 5, 1959, at the direction of Roach 100,000 shares of the Guild Films stock were issued in the name of W-R, and 100,000 in two 50,000-share certificates in the name of Rabco.

It was then that the treasurer of Guild Films directed the stamping of the legend by the Transfer Agent prior to transferring the stock to Rabco and W-R. Nowhere on the certificate was there any reference to paragraph "5" of the agreement. The remaining 200,000 shares have never been issued, as the promised film properties were not received from W-R. On that same day, February 12, 1959, the Santa Monica Bank read in the Wall Street Journal that the Jacobs stock had been suspended by the Securities and Exchange Commission from all trading and sent a telegram to Roach demanding payment on both loans by February 16, 1959, and stating that if this was not done the Bank would have to take immediate steps to sell the stock to liquidate the loans. This is just what it did one week later. When the transfer agent refused to transfer the stock to the Santa Monica Bank by reason of the restrictive legend, the Bank telegraphed Guild Films on March 5, 1959, requesting it to release the stock or issue substitute certificates and stating that, if this was not done by the time specified, the Bank would have to submit the matter to the American Stock Exchange and the Security Exchange Commission "for their assistance and release." This the Transfer Agent refused to do on the ground that the stock was subject to the restrictive legend.

Sometime after this, the Santa Monica Bank offered to exchange the 50,000 shares for 25,000 shares of free stock but this the Guild Films also declined to do. Nothing further was done by the Santa Monica Bank until the institution of the proceeding in the New York Supreme Court to compel the transfer. No application was ever made to the Securities and Exchange Commission for a release, although the Santa Monica Bank apparently recognized that something was required to be done before the stock could be sold as free stock.

■ Section 5(a) of the Act, 15 U.S. C.A. § 77e(a), requires that a registration statement be in effect before a security is sold or delivered after sale. Section 4(1), 15 U.S.C.A. § 77d(1), exempts from the registration requirements of Section 5, transactions by any person other than an issuer, underwriter or dealer. Section 2(11), 15 U.S.C.A. § 77b(11), defines an underwriter as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking * * *".

It is not now urged by the Commission that the Santa Monica Bank is either an issuer or a dealer; the only question presented for our determination is whether by reason of the part it played in these dealings it became an under-

writer of the stock. The answer lies in whether or not the acquisition of stock by it was in the nature of a pledge of collateral, as security for the loan, or whether its acquisition was for the sole purpose of selling and repaying the loan. The Santa Monica Bank takes the position that it received the stock in pledge.

The Act prohibits purchases with a view to distribution. If the Santa Monica Bank is a bona fide pledgee now seeking to sell collateral it acquired in good faith to secure the debt, it would not appear to come within the statutory prohibition. See Loss, p. 333; H.R. 4314, S. 875, 73rd. Congress, 1st Sess., 1933; 4 Law & Contemporary Problems —89—Jan. 1939.

The fact that a pledge as such is not exempt by the Act is not significant, since the activities proscribed by their terms exclude a pledge transaction. The touchstone to the transaction is the good faith of the parties—a good faith consisting not of an absence of intent to evade the statute, but an absence of intent on the part of the one delivering the property that it be sold and an absence of intent on the part of the one receiving it, at the time he receives the property to sell it. If this is so (and we hold it is a reasonable reading of the statutory language), then Roach would have been free to pledge the stock as security for his debt, in spite of the restrictive legend, for all that this did was issue warning that the stock was subject to the provisions of the Act in the event of a sale or distribution. The issuer's attempt to further restrict the value of the stock by forbidding its pledging would find no justification under the statute to which it specifically referred and which is the only law we have here under consideration. Moreover, Roach did not under paragraph "5" of the contract warrant that he would not pledge the stock, but only that he would not resell or distribute it.

Because of our ultimate conclusion that this transaction between Roach and the Santa Monica Bank was not a pledge transaction at all, we need not determine what effect, if any, such a legend would have on a sale by a bona fide pledgee who was forced to liquidate such collateral on the unexpected inability of his creditor to pay his debt. Cf. Sweet's Steel Comp., 4 SEC 589.

Although ostensibly Roach purchased the stock for investment which was the only way he could acquire it for Guild Films was relying on a private distribution exemption, he unquestionably intended to turn it over to the Santa Monica Bank for immediate sale, which he promptly did. In spite of the financial statement submitted by him to the Santa Monica Bank in September, 1958, Roach's financial position at that time was far from secure. A good part of the proceeds of the loan he had used to purchase Jacobs stock, in turn to post it as collateral for the loan and to fulfill other stock purchase commitments. Roach was financially pressed in December, 1958, when the Jacobs stock dropped to $5; he apparently had commitments to purchase more of this stock and no money with which to pay for it; he was indebted to the Pacific National Bank in the sum of $53,700 on a note which matured in March, 1959; he was unable to pay the Bank's notes as they matured. Although he sorely needed an extension of time in which to pay, he was unable to deliver sufficient collateral to accomplish this; he held his creditor at bay by promising additional collateral in the form of the Guild Films stock. He never promised the Santa Monica Bank to pay the principal amount of the past due notes and as a matter of fact never paid more than a total of $1,400 interest in December, 1958. on the entire loan. The Jacobs stock of which he held large holdings had become practically worthless. The last thing (in the way of things material) in the world which Roach needed or sought in January, 1959, when he contracted to purchase the Guild Films stock for investment, was more stock which he could not convert into cash—but in order to acquire it, he had to promise to hold it for investment. The other 100,000 shares issued in the name of W-R were

used by Roach to pay off another creditor in similar fashion. The conclusion is inescapable that when he purchased the stock he did so in order to have the Santa Monica Bank sell it for his benefit, since he himself could not, and by so doing he became an underwriter under Sec. 2(11). Gilligan, Will & Co. v. S. E. C., 2 Cir., 267 F.2d 461; In re Dempsey & Co., C.C.H. Fed. Sec., L.Rep. No. 76585, May 7, 1958; Reiter Foster Oil Co., 6 SEC 1028.

■ The Santa Monica Bank, in turn, was no more interested than Roach in acquiring stock which it could not liquidate promptly; not only had it parted almost five months before with $60,000 of its own but with $60,000 additional from the Southwest Bank. It was under pressure to see that the loans were properly secured; it found itself with none whatsoever; its attempts to collect from Roach had been fruitless and it never discussed with Roach, when it accepted the Guild Films stock, the possibility of payment by him. It is clear it was no longer looking for or hoping for payment from him; it knew of Roach's corporate difficulties which by this time were public knowledge. All the Santa Monica Bank could do was to wait in the hope that Roach would turn up with something which would permit it to make good on some part of its loss and its chances of doing so depended on a successful distribution of the stock. Oklahoma Texas Trust, 2 SEC 769; Unity Gold Corporation, 3 SEC 618. The action of the Santa Monica Bank, while for its direct benefit, was ultimately for the benefit of Roach who in exchange for an extension on a past due debt of $120,-000 planned to be able to sell "tainted" stock through the Bank. To constitute the Santa Monica Bank an underwriter, it was not necessary that it have been in privity with the issuer or that it have had an agreement with Roach or Guild Films to distribute the stock. It was sufficient that it consciously engage in the public distribution of restricted stock on behalf of Roach and the issuer, and it can no more claim an exemption under the Act than could either of them. Securities and Exchange Commission v. Culpepper, 2d Cir., 270 F.2d 241; Securities and Exchange Commission v. Chinese Consol. Benev., 2d Cir., 120 F.2d 738; Gilligan, Will & Co. v. S. E. C., supra; Dempsey v. S. E. C., supra.

■ Because of the complete indifference of the Santa Monica Bank to the opinion of the Commission, its failure for several months to seek its advice, its sale of some of this stock and its declared intention to sell the balance in the face of the considered opinion of the Commission in September, 1959, that the stock was not exempt, it is necessary in the protection of public interest to continue the restraint against any further sales or delivery after sale of this stock pending ultimate determination of the suit.

Settle order on notice to all so providing.