SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Respondent,

v.

GUILD FILMS COMPANY, Inc., Santa Monica Bank, Southwest Bank of Inglewood, Hal Roach, Jr., Defendants-Appellants.

No. 267, Docket 26039.

United States Court of Appeals Second Circuit.

Argued Feb. 11, 1960.

Decided May 19, 1960.

486

Jacob Rapoport, New York City (Joel Arnold, New York City, of counsel), for defendants-appellants.

Thomas G. Meeker, Gen. Counsel, Securities & Exchange Commission, Washington, D. C. (Joseph B. Levin, Asst. Gen. Counsel, Washington, D. C., Arthur Goldman, New York City, and Frederic G. Gale, Washington, D. C., on the brief), for plaintiff-appellee.

Before MOORE, Circuit Judge, and SMITH and HERLANDS, District Judges.

MOORE, Circuit Judge.

This is an appeal under 28 U.S.C.A. § 1292(a) from an order by the district court, 178 F.Supp. 418, granting a preliminary injunction to restrain the sale of 50,000 shares of Guild Films Company, Inc. common stock by two of the appellants, the Santa Monica Bank and The Southwest Bank of Inglewood. Pending a final determination of this action, the preliminary injunction was issued "unless and until" a registration statement should be filed under the Securities Act of 1933, 15 U.S.C.A. § 77a et seq.

Section 5 [1] of the Act makes it unlawful for anyone, by any interstate communication or use of the mails, to sell or deliver any security unless a registration statement is in effect. Section 4 provides, however, that "the provisions of

---

1. Sec. 5. "(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

\* \* \* \* \*

"(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 8."

section 5 * * * shall not apply to * * * (1) Transactions by any person other than an issuer, underwriter, or dealer." The banks claim that they come within this exemption to the registration requirements. The district court rejected this claim, holding that the banks were "underwriters" within the meaning of the Act. While the issue involved can be simply stated, a rather complete discussion of the facts is necessary.

*The Original Loans by the Banks and the Security Therefor*

On September 17, 1958, the Santa Monica Bank and The Southwest Bank of Inglewood jointly agreed to loan Hal Roach, Jr., $120,000, represented by two notes. An unverified, undated financial statement submitted by Roach was relied upon in making the loan. The money was deposited in a joint checking account in the name of Roach and Charles H. Meacham. Roach's note for $60,000 to the Santa Monica Bank, which was to manage the loan for both banks, was dated September 17, 1958, and his note to The Southwest Bank for the same amount was dated September 25, 1958. Both notes were treated as due on December 15, 1958, although the note to The Southwest Bank was actually payable 18 days earlier.

The loans were initially secured by 34,475 shares of the Scranton Corp. (valued at $15 per share) and 2,000 shares of F. L. Jacobs Co. stock (valued at $8 per share). As agreed, this collateral was soon replaced by 30,000 shares of Jacobs stock. Roach had used a large part of the proceeds of the loans to purchase a substantial number of the 30,000 Jacobs shares put up as collateral.

*The Jacobs Stock and the Renewal Notes*

Roach was an officer, director, and the controlling shareholder of F. L. Jacobs Co., of which Alexander L. Guterma was president. This company controlled the Scranton Corp. which owned Hal Roach Studios, which in turn owned both W-R Corp. and Rabco T. V. Production, Inc.

W-R Corp. and Guild Films, Inc. had made an agreement on January 23, 1959, under which W-R Corp. was to obtain 400,000 shares of Guild Films common stock (the registration of 50,000 shares of this stock is here in dispute) and a number of promissory notes in exchange for certain film properties. The stock was not registered with the S. E. C., but Guild Films agreed to use its best efforts to obtain registration. However, seeking to come within an exemption provided in section 4 of the Securities Act, the parties provided the following in their agreement:

"Stock Taken for Investment: W-R warrants, represents and agrees that all of the said 400,000 shares of Guild's common stock being contemporaneously issued hereunder, whether registered in the name of W-R or in accordance with the instructions of W-R, are being acquired for investment only and not for the purpose or with the intention of distributing or reselling the same to others. Guild is relying on said warranty and representation in the issuance of said stock."

On February 5, 1959, for reasons discussed below, Roach directed that 100,000 shares of the Guild Films stock be issued in the name of W-R Corp. and 100,000 shares (represented by two 50,000 share certificates) in the name of Rabco. Meacham, the treasurer of Guild Films, directed that the transfer agent stamp this restriction on the stock certificates:

"The shares represented by this certificate have not been registered under the Securities Act of 1933. The shares have been acquired for investment and may not be sold, transferred, pledged or hypothecated in the absence of an effective registration statement for the shares under the Securities Act of 1933 or an opinion of counsel to the company that registration is not required under said Act."

The remaining 200,000 shares were not issued as the promised film properties were never transferred.

Although the Guild Films stock was issued "for investment only," the district

court found that Roach "unquestionably" purchased it in order to have it resold. "In spite of the financial statement submitted by him to the Santa Monica Bank in September, 1958, Roach's financial position at that time was far from secure. A good part of the proceeds of the loan discussed below he had used to purchase Jacobs stock, in turn to post it as collateral for the loan and to fulfill other stock purchase commitments. Roach was financially pressed in December, 1958, when the Jacobs stock dropped to $5; he apparently had commitments to purchase more of this stock and no money with which to pay for it; he was indebted to the Pacific National Bank in the sum of $53,700 on a note which matured in March, 1959; he was unable to pay the Bank's notes as they matured. Although he sorely needed an extension of time in which to pay, he was unable to deliver sufficient collateral to accomplish this; he held his creditor at bay by promising additional collateral in the form of the Guild Films stock." These findings are uncontested.

On December 9, 1958, the Santa Monica Bank learned that the Jacobs stock had been suspended from trading on the New York Stock Exchange. That bank thereupon wrote to Roach asking him to liquidate the loan before December 15, 1958, because the Jacobs stock, which was then traded over-the-counter and had dropped in value to $5 per share, was "not now considered by our Loan Committee as acceptable collateral." After a number of conversations, the Santa Monica Bank agreed to renew Roach's note for 90 days upon deposit of 10,000 additional shares of Jacobs stock, or an equivalent in value in Scranton stock or upon payment of $30,000. A renewal note dated December 18, 1958 was sent to Meacham for Roach's signature, and interest on the matured note requested. The Santa Monica Bank agreed to renew on the same conditions. The notes were signed and returned, but Meacham requested "a few days in which to make up our minds" concerning the required additional collateral. Until the end of January, 1959, both banks were in constant communication with Roach, but no further collateral was deposited. On December 31, 1958, The Southwest Bank had informed him that its renewal would not be effective until additional security was supplied, and on January 28, 1959, it wrote to Roach demanding, by February 3, 1959, payment of the November 24, 1958 note, then more than six weeks overdue. On February 3, 1959, Roach telegraphed the Santa Monica Bank that he had "deposited $75,000 Guild Films, Inc. notes to your account at Chemical Corn Bank, New York. This best I can do till I return to Los Angeles next week." On the basis of this telegram, The Southwest Bank wrote to Roach agreeing to defer action until February 10th.

*The Guild Films Stock*

On that date Roach wired The Southwest Bank that he had sent 50,000 shares of Guild Films stock to the Santa Monica Bank. By a divided vote the Loan Committee of The Southwest Bank decided to renew the note, making it payable "On 'Demand' if 'No Demand' then all due March 18, 1959." On February 12th, one of the 50,000 share Guild Films certificates in the name of Rabco T. V. Productions was received by the Santa Monica Bank. The restrictive legend quoted above was stamped on the face of the certificate. Upon receipt thereof, the Santa Monica Bank authorized the Chemical Corn Exchange Bank in New York to release the Guild Films notes.

*Subsequent Attempts by the Banks to Sell the Guild Films Stock*

On February 12th, the Santa Monica Bank and The Southwest Bank learned that the Jacobs stock had been suspended from all trading by the S. E. C. The Santa Monica Bank immediately telegraphed Roach demanding payment by February 16th, and stating that otherwise the stock would be sold to liquidate the loan. Roach failed to pay and the banks attempted to sell the securities through brokers on the American Stock Exchange.

The Guild Films transfer agent refused to transfer the stock to the banks

because of the stamped restriction. The Santa Monica Bank then wired Guild Films that unless the stock was released or exchanged for unrestricted securities, the matter would be taken to the American Stock Exchange and the S. E. C. "for their assistance and release." Guild Films refused to act; it also refused an offer to exchange the 50,000 shares for 25,000 shares of unrestricted stock; and no application for registration was made to the S. E. C.

In August, 1959, the Santa Monica Bank brought an action against Guild Films in the New York Supreme Court to compel the transfer of the stock. On September 18, 1959, that court ordered the transfer of the stock to the bank. The court based its order on a referee's report which found that the stock was exempt from the Securities Act of 1933. The Santa Monica Bank thereupon ordered 9,500 shares of the Guild Films stock sold. The S. E. C. learned of the sale and notified the bank and Guild Films that the stock could not be sold without registration. The bank then sought a Commission ruling that the stock was exempt. Despite an adverse opinion by the Commission, the bank sold an additional 10,500 shares on September 24, 1959. At that point, the Commission filed this suit to restrain the delivery of these shares and the sale of the remainder of the stock. The district court granted a preliminary injunction against delivery and further sale.

■ The Securities Act of 1933 was primarily intended to "protect investors by requiring registration with the Commission of certain information concerning securities offered for sale." Gilligan, Will & Co. v. S. E. C., 2 Cir., 1959, 267 F.2d 461, 463. An exemption from the provisions of § 5 of the Act was provided by § 4(1) for "transactions by any person other than an issuer, underwriter or dealer" because it was felt that no protection was necessary in these situations. See H.R.Rep. No. 85, 73rd Cong., 1st Sess. (1933) at p. 15. The primary question involved in this case is: were

appellants issuers, underwriters or dealers within this exemption?

■ An "underwriter" is defined in § 2(11), 15 U.S.C.A. § 77b(11), as "any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security, * * * or participates or has a participation in the direct or indirect underwriting of any such undertaking * * *." The burden of proof is on the one seeking an exemption. Gilligan, Will & Co. v. S. E. C., supra.

■ The banks cannot be exempted on the ground that they did not "purchase" within the meaning of § 2(11). The term, although not defined in the Act, should be interpreted in a manner complementary to "sale" which is defined in § 2(3) as including "every * * * disposition of * * * a security or interest in a security, for value * *." In fact, a proposed provision of the Act which expressly exempted sales "by or for the account of a pledge holder or mortgagee selling or offering for sale or delivery in the ordinary course of business and not for the purpose of avoiding the provisions of the Act, to liquidate a bona fide debt, a security pledged in good faith as collateral for such debt," was not accepted by Congress. S. 875, 73rd Cong., 1st Sess. (1933) § 126. Cf. Throop & Lane, Some Problems of Exemption Under the Securities Act of 1933, 4 Law & Contemp.Prob. 89, 124 n. 103 (1937).

Nor is it a defense that the banks did not deal directly with Guild Films. This court has recently stated that "the underlying policy of the Act, that of protecting the investing public through the disclosure of adequate information, would be seriously impaired if we held that a dealer must have conventional or contractual privity with the issuer in order to be an 'underwriter'." S. E. C. v. Culpepper, 2 Cir., 1959, 270 F.2d 241, 246, following S. E. C. v. Chinese Consol. Benev. Ass'n, 2 Cir., 1941, 120 F.2d 738, certiorari denied, 1942, 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497. It was held in these two cases

that § 4(1) "does not in terms or by fair implication protect those who are engaged in steps necessary to the distribution of a security issue. To give Section 4(1) the construction urged by the defendant would afford a ready method of thwarting the policy of the law and evading its provisions." S. E. C. v. Chinese Consol. Benev. Ass'n, supra, 120 F.2d at page 741.

The banks have contended that they were "bona fide pledgees" and therefore "entitled upon default to sell the stock free of restrictions." They assume that "good faith" in accepting the stock is a sufficient defense. See Loss, Securities Regulation, 346 (1951). But the statute does not impose such a "good faith" criterion. The exemption in § 4 (1) was intended to permit private sales of unregistered securities to investors who are likely to have, or who are likely to obtain, such information as is ordinarily disclosed in registration statements. See S. E. C. v. Ralston Purina Co., 1953, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494. The "good faith" of the banks is irrelevant to this purpose. It would be of little solace to purchasers of worthless stock to learn that the sellers had acted "in good faith." Regardless of good faith, the banks engaged in steps necessary to this public sale, and cannot be exempted.

Without imputing to the banks any participation in a preconceived scheme to use the pledge of these securities as a device for unlawful distribution, it may be noted that when the 50,000 shares of Guild Films stock were received on February 12, 1959, the banks knew that they had been given unregistered stock and that the issuer had specifically forbidden that the stock "be sold, transferred, pledged or hypothecated in the absence of an effective registration statement for the shares under the Securities Act of 1933 or an opinion of counsel to the company that registration is not required under said Act." Furthermore, from Roach's prior unfulfilled promises, the banks should have known that immediate sale was almost inevitable if they were to recoup their loans from the security received. On February 11, 1959, the day before the stock was received, the S. E. C. suspended trading in the Jacobs stock. And on the very day that the stock was received, appellants wired Roach that they would call the loan unless payment were made. For months the banks had threatened action but declined to act; circumstances finally required action. The banks cannot now claim that this possibility was unforeseeable. The district court properly enjoined the threatened violation.

Affirmed.