Murray J. FOX, Dorothea Fox, Sol Fox and Sylvia Frost, on behalf of themselves and as representatives of all other persons similarly situated, Plaintiffs,

v.

GLICKMAN CORPORATION, Louis Glickman, Louis A. Siegel, Aaron Katz, William M. Jennings, William G. Dillon, Bache & Co., Hirsch & Co., Incorporated, Hirsch & Co. and Morris Cohon & Company, Defendants.

Arthur RUDNICK, Paul and Jean Carl, Helen Orsano, Florence Verdirame, Gabriel and Ruth Ascher, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

FRANCHARD CORPORATION (formerly known as the Glickman Corporation), Louis J. Glickman, Louis A. Siegel, William M. Jennings, Seymour Young, Aaron Katz, Morris Cohon & Co., David Berdon & Co., Hirsch & Co., Bache & Co., and the Venada Corporation, Defendants.

Morris LAZAR et al., Plaintiffs,

v.

FRANCHARD CORPORATION (formerly Glickman Corporation), Bache & Co., Hirsch & Co. Incorporated, Morris Cohon & Company, Louis J. Glickman, Louis A. Siegel, Aaron Katz and Seymour Young, Defendants.

Nos. 63 Civ. 759, 63 Civ. 1784 and 63 Civ. 2827.

United States District Court
S. D. New York.

May 3, 1966.

See also D.C., 237 F.Supp. 871.

■■■■■■■■■■■■■■■■

———◆———

Herman Odell, New York City, for plaintiffs in Fox.

Stanley L. Siegel, New York City, for plaintiffs in Rudnick; Malchman & Klied, Irving Malchman and Jerome J. Klied, New York City, of counsel.

Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiffs in Lazar; Stanley L. Kaufman and Shephard S. Miller, New York City, of counsel.

Stroock & Stroock & Lavan, New York City, for defendant David Berdon & Co.; David Schwartz and Gerald D. Fischer, New York City, of counsel.

Kramer, Bandler & Labaton, New York City, for defendant Morris Cohon & Co.; Sidney Kramer and Edward Labaton, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for all other defendants; Roy L. Reardon and John R. Cannell, New York City, of counsel.

Sullivan & Cromwell, Stuart W. Thayer and Marvin Schwartz, New York City, of counsel, for defendant Bache & Co.

Guggenheimer & Untermyer, Harry Hoffman, New York City, of counsel, for defendant Hirsch & Co.

Bergerman & Hourwich, New York City, for Harry H. Levy, an applicant for intervention in Fox; George K. Hourwich and Joseph Calderon, New York City, of counsel.

Sidney S. Bobbe, New York City, for objectants Arch and Alberta De Bear.

Rosenberg & Rosenberg, New York City, for George Garatti, nominee for Mastan Co., Inc.; Joseph Feldman, New York City, of counsel.

Lewis Herman, Hicksville, N. Y., for objectant Benjamin Bloch.

Stanley Frederick, New York City, for objectant Ely Tarplin.

Cole & Deitz, New York City, for objectant Meadow Brook National Bank; Frederick D. Schroeder and Myron Wiess, New York City, of counsel.

Livingston, Livingston & Harris, New York City, for objectants Bank of North America, Royal National Bank of New York, Trade Bank and Trust Co., American Trust Co. and Israel Discount Bank; I. Alan Harris and Joseph W. Greenberger, New York City, of counsel.

METZNER, District Judge.

The parties have submitted an agreement of compromise and settlement for approval by the court, pursuant to Fed. R.Civ.P. 23(c).

Three spurious class actions were instituted on March 18, 1963, June 17, 1963 and September 27, 1963, respectively, alleging violations of sections 11, 12 and 17(a) of the Securities Act of 1933 and section 10(b) of the Securities Exchange Act of 1934 and the rules promulgated thereunder by the Securities and Exchange Commission.

Three registration statements dated October 12, 1960, October 2, 1961 and December 1, 1961 are involved in the litigation. The alleged misstatements and omissions contained in these registration statements concern themselves with the projected "cash flow" to be generated by the properties owned by the defendant Franchard Corporation, formerly Glickman Corporation (herein the Corporation), withdrawals and advances of corporate funds for the benefit of Venada Corporation, wholly owned by Louis Glickman personally, pledges of the Corporation stock owned by Glickman to secure loans made to him and his wholly owned corporations, Glickman's personal financial condition, and abdication by the board of directors of the Corporation of their duties and responsibilities.

The pretrial proceedings were extensive, consisting of 28 days of depositions, in which some 4,000 pages of testimony were taken, the marking of some 400 exhibits, and numerous pretrial conferences. In addition, the record of the hearings, with its exhibits, before the Securities and Exchange Commission and the decisions of the hearing exam-

iner and the Commission were before the court. The matter was set for drafting of the final pretrial order on March 23, 1965 and a trial date was fixed for May 4, 1965. While the parties were engaged in day-to-day conferences in drafting this final pretrial order, settlement negotiations were instituted, which culminated in the signing by all parties of the agreement of compromise and settlement dated June 25, 1965. On June 28, 1965 the court entered an order consolidating the three cases.

Notice of the instant application was mailed to some 30,000 stockholders of the Corporation, and published in various newspapers throughout the country. The stockholders were also advised that applications for the fixing of attorneys' fees and allowances would be heard in conjunction with the hearing on the agreement of compromise and settlement. Three days of hearings ensued, at which all present were afforded an opportunity to be heard.

The agreement provides for the payment by the defendants of the sum of $1,825,000 to settle all claims which have been asserted or could have been asserted under the complaints, as amended, and that the prosecution by any person of such claims be forever barred. Out of the sum of $1,825,000 there are to be paid all fees, allowances and disbursements fixed by the court in connection with the prosecution of the claims, and all expenses necessary to administer the settlement and disburse the fund.

The attorneys for the various plaintiffs agreed that in no event should the amount allowed for attorneys' fees, disbursements and accountants' services exceed the sum of $425,000. The amount awarded on the applications for counsel fees is discussed below.

Authorized claimants to the fund are limited to those who purchased stock of the Corporation between October 12, 1960 and April 12, 1963. Purchasers of the stock are divided into (a) those who purchased the stock between the dates referred to above, and (b) those who exchanged units they owned in syndications of parcels of real estate for stock of the Corporation pursuant to the first registration statement of October 12, 1960. All together, some 4,800,000 shares of stock of the Corporation were distributed under the various registration statements.

The fixing of the cutoff date of April 12, 1963 is approved because by that time all of Glickman's financial problems were well known and, more import, the Corporation had issued and distributed to its stockholders an annual financial report on April 5, 1963, covering the year ending December 31, 1962, furnishing an accurate picture of the Corporation's financial condition. The existence of such report was advertised in New York newspapers on April 11, 1963. Section 11(a) of the Securities Act of 1933 provides that the right of recovery, therein provided, shall be conditioned on proof that a purchaser subsequent to the date of such financial statement relied nevertheless on a previous registration statement in purchasing the stock.

The agreement provides that for those persons purchasing between October 12, 1960 and October 1, 1961 the maximum allowable purchase price of $10 per share is established. This is within the limits fixed by section 11(e) of the Securities Act of 1933. The so-called exchange offerees also acquired their shares pursuant to the registration statement of October 12, 1960. They, however, are not allowed the price of $10 a share. There was no readily available market for these units prior to October 12, 1960. A formula for determining value had to be devised.

The exchange value per share was computed separately for each of the companies whose capital units were exchanged for common stock of the Corporation. First, it was determined to take the appraised value of each of the properties as close to October 12, 1960 as possible, and substitute this appraised value for the book value carried on the

balance sheets of the respective syndicates. The net appraised asset value was then divided by the total number of shares offered by the Corporation in the exchange offer to obtain a per share figure. The out-of-pocket cost basis of each unit to the various syndicate members was then determined. The amount per share and the cost basis were averaged for each syndicate and the resulting figure became the exchange value per share of the Corporation stock to each exchange offeree. This exchange value is the maximum allowable purchase price for such claimants. I find this formula fair and reasonable under all the circumstances.

■■ The maximum of $11.125 per share has been set for persons purchasing the stock between October 2, 1961 and April 12, 1963. The stock issued under the second registration of October 2, 1961 was at a price of $12.50 a share. By June 29, 1962, the date of the first public awareness concerning Glickman's difficulties, the stock had fallen to the price of $11.125. This drop cannot be attributed to the alleged misrepresentations and omissions in the registration statement, but rather to other market conditions which may not be taken into consideration in fixing damages under section 11(e). Consequently, the price of $11.125 for this group is proper.

■ For the purpose of fixing damages, the agreement also sets a minimum valuation of $4 per share. This was the value of the stock on April 12, 1963, the cutoff date, at which time the 12-months' earnings statement was available. I find this figure is reasonable, especially in view of the market's reactions to Glickman's problems. In November and early December of 1962, publicity regarding the Corporation and Glickman's ouster from control resulted in a drop of the stock from $9 a share to $5.50 a share. It might have been proper to have used this figure as the minimum valuation, but to give full effect to all of the claimed deficiencies, the cutoff date appears to be more equi-

table. Certainly any decline after April 12, 1963 could not be traced to the alleged deficiencies in the registration statements.

■ The dividends paid by the Corporation up to January 1963 are to be subtracted from any damages claimed by a shareholder. These distributions were a return of capital and not taxable to the stockholders. Therefore the deduction is proper.

The agreement provides that shareholders holding as pledgees from Glickman or his affiliates are not to be considered as authorized claimants. The exclusionary provisions were inserted on the assumption that anyone who came within their terms must have had knowledge of the matters complained of in the complaints. Objections to this provision were presented by a group of banks which held the stock as collateral for loans.

It was agreed by counsel for the plaintiffs and for the defendants that the Meadow Brook National Bank was not foreclosed by the terms of the agreement of compromise and settlement from presenting a claim under the settlement agreement. The amount of the claim to be allowed would be for determination by the special master to be appointed to supervise the carrying out of the settlement provisions.

The remaining pledgees consisted of five banks (Trade Bank and Trust Company, Israel Discount Bank, Bank of North America, American Trust Company and Royal National Bank of New York) and Mastan Company, Inc., a finance company. All of these institutions loaned money either to Louis Glickman personally or his wholly owned corporation, Venada Corporation. Stock of the Corporation was pledged as collateral for these loans. The original loans with each of these objectants were made after the first registration of October 12, 1960. Some of the loans were repaid on their due date and subsequently new loans were made. Some of the loans were extended or renewed on the due date. Some of the loans were

increased on the due date, but the original collateral was maintained, plus additional collateral being pledged in some instances. The five banks filed claims in the bankruptcy proceedings of Louis Glickman and Venada Corporation. Mastan did not file a claim, but agreed with the trustees to a transfer of legal title in the collateral.

It is the contention of the objectants that these exclusionary provisions are unfair insofar as they are concerned. They argue that they were bona fide pledgees, and that they did not know of any of the alleged defects in the registration statements which are the basis of the class actions brought by the plaintiffs, that they made the loans in good faith, and that their credit departments relied, among other things, on the registration statements in determining the value of the Corporation stock.

In order to determine the objection raised by these pledgees, it is necessary to ascertain whether they come within any definition of a class as described in the various complaints, and if such is the case whether it was reasonable to exclude them from participation in the settlement. Obviously, if they were not included in any of the classes defined by the complaints, then the agreement of compromise and settlement would not foreclose them from an independent action against these defendants. Of course, the defendants would like to have them included as part of a class, since the agreement of compromise and settlement provides, in paragraphs IX B and C, that the final judgment dismiss all claims against all defendants on their merits with prejudice, and forever bars prosecution by any person of any of the claims set forth in paragraph II of said agreement.

The resolution of the question whether these objectants come within any of the classes defined by the complaints depends to large extent on their status as purchasers. This leads to a consideration of the decision in SEC v. Guild Films Co., 279 F.2d 485 (2d Cir.), cert. denied, Santa Monica Bank v. SEC, 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960). That case held pledgee banks to be underwriters within the meaning of section 2(11) of the Securities Act of 1933. The result was that the banks could not sell their stock unless it was registered. The important effect here is that if these pledgees are found to be underwriters, they could not claim benefits under the provisions of law on which these actions are predicated.

In finding that the pledgee banks were underwriters under section 2(11), the court in *Guild Films* clearly held that the pledge constituted the banks "purchasers." It has been argued that this finding of a purchase must be confined to a situation where it is sought to pin liability on the banks, not where it might grant them protection. The court is not persuaded by this argument and finds that the pledgee banks were purchasers.

The impact of *Guild Films* in part has been confusion, because the court went beyond the facts in the case, which by themselves would have justified a finding that the banks took the stock with a view to distribution and therefore were underwriters. The certificates delivered as collateral contained a legend that they were unregistered, that they were originally acquired for investment only, and could not be sold, transferred or pledged in absence of a registration statement. See the district court opinion, SEC v. Guild Films Co., 178 F.Supp. 418 (S.D.N.Y.1959), and the circuit court opinion itself, 279 F.2d at 490.

The pledgees in the instant case, unlike those in *Guild Films*, did not take collateral for already overdue personal notes with the expectation of immediate sale. Rather, most stock was taken at the initial making of loans. Thus it is unclear whether the ambit of *Guild Films* extends to the pledgees herein. See 1 Loss, Securities Regulation 649 (2d ed. 1961) ("lawyers must guess"); Pierce, Securities and Exchange Commission v. Guild Films Co., Inc., 16 Bus. Law. 603 (1961) ("subsequent litigation to determine implications"); Sargent,

The Guild Films Case, The Effect of "Good Faith" in Foreclosure Sales of Unregistered Securities Pledged as Collateral, 46 Va.L.Rev. 1573, 1584 (1960) (gives possible broad and narrow scope of opinion); 48 Calif.L.Rev. 84 (1960); 60 Colum.L.Rev. 1179 (1960); [1960] Duke L.J. 638; 74 Harv. L.Rev. 1241, 1242 (1961) ("alternative holding"); 36 N.Y.U.L.Rev. 901, 905 ("uncertain"); 13 Stan.L.Rev. 652 (1961) ("unclear"); 34 Temp.L.Q. 323, 326 (1960) ("clarification is needed"); 8 U.C.L.A. L.Rev. 663 (1960).

Because of the uncertainty of application of *Guild Films* to the instant facts, extensive hearings as to each of the objectants' knowledge and intent, plus litigation through appellate levels on the issues of law involved, would be necessary if the objectants were to proceed.

█ A formula has been submitted to the court by a stipulation entered into by objectants, counsel for plaintiffs and counsel for defendants in an effort to settle the position of these claimants. In essence the claimed recognized loss, as that term is defined in the agreement of compromise and settlement, has been reduced in the case of the five banks to two thirds of its value and to one half of its value in the case of Mastan Company. In addition, there is a limitation on the total recovery each may receive under this formula. The modification of the positions of all parties, together with the uncertainty of the issues of law and fact involved, leads the court to find the formula fair and reasonable.

█ The agreement of compromise and settlement provides a two-stage distribution, depending on whether a claim is filed within 90 days or within 120 days. This appears to me to be cumbersome and costly. A conference was had with the signatories to the agreement. Upon the affirmative assent of each of them, the agreement is modified to provide for the filing of claims within 100 days after the application forms are mailed, and distribution is to be made only to those filing within that period.

The December 1961 registration statement related to the purchase by the Corporation from a partnership known as 42 Broadway Associates of a sublease of 42 Broadway, New York, N. Y., for a purchase price of $704,500. While no specific exchange value per share is specified in the agreement of compromise and settlement, the court deems it reasonable for the partners in 42 Broadway Associates who exchanged their partnership units for Class A stock to have purchased the shares at a price of $12.50 per share and therefore to fall within the computations provided for in subparagraphs IV B(4) (c) and (f) of the agreement of compromise and settlement.

Settlements of class actions present many problems. It is in the intrinsic nature of a settlement that no party will completely fulfill the expectations it had at the start of a case. Plaintiff's affirmative case may be stronger against some defendants and weaker against others. In the instant case the plaintiffs have the problems of reliance, causality and damages. The defendants have statutory defenses and in many cases indemnification agreements with the Corporation to buttress their positions. The evaluation of these factors presents an almost insuperable task.

It would seem that the starting point is the potential recovery by the plaintiffs. It has been indicated that the potential maximum recovery is somewhere between $3,000,000 and $7,000,000. If this figure were to be averaged, the result would be about $5,000,000 potential maximum recovery.

There have been few cases of this nature which contain as full a disclosure of factual material. In addition to the entire record before the Securities and Exchange Commission and the Commission's findings and determination, there were extensive pretrial proceedings in this court, and the trial of the issues was scheduled to start in a few weeks when settlement discussions were initiated. From the point where settlement

loomed as a possibility, many hours were spent evaluating and re-evaluating the case to achieve objectivity in result—a result probably more in accord with the true nature of the facts than any fact-finding made by judge or jury. Further, the difficult questions of law extant in this case are validly reflected in the agreement of compromise and settlement. The court finds that while accord was reached, the interests of many persons in respective classes were not compromised. Their claims were pressed with vigor and diligence. The attorneys for all parties were competent to represent the various interests and this factor has weighed heavily with the court in coming to its conclusion. Finally, out of 30,000 stockholders to whom notices were sent, only 21 indicated objections to the proposed settlement.

█ The offer in settlement amounts to $1,825,000, which is about 36% of the average potential maximum recovery. From the court's knowledge of the case, drawn from pretrial conferences, oral argument and reading hundreds of pages of briefs and transcripts, and the indicia already adverted to, I find that the offer in settlement is a fair one.

█ Some question has been raised as to whether disclosure should be made as to each defendant's contribution to the offer in settlement. It is already known that the Corporation is contributing $1,400,000. I don't think that it is necessary to require disclosure of the individual contributions if the total settlement is satisfactory. Those contributions amounting to some $425,000 are coming from defendants, all of whom, at the very least, have indemnification agreements with the Corporation, and this without regard to the available individual defenses.

█ One final word on the proposed settlement insofar as it provides that the approval of this settlement and entry of judgment thereon is a bar to any future claims "of every nature and description which have been asserted or which could have been asserted in each of the above lawsuits". The legal efficacy of such an order is frankly in doubt. See Cherner v. Transitron Electronic Corp., 221 F.Supp. 48, 53 (D. Mass.1963). See also Derdiarian v. Futterman Corp., 63 Civ. 1367, 38 F.R.D. 178, S.D.N.Y., September 8, 1965. It seems to the court that unless such an order is possible none of these suits as a practical matter can ever be settled, since no defendant will pay until the statute of limitations has run against every possible claim.

In this case the problems of the Corporation received wide publicity, but only three lawsuits were commenced in 1963 and the only application to intervene was first made in March of 1965. As already indicated, the most complete notice was given of the application to the court to approve the settlement. Each of the 30,000 stockholders received the full text of the agreement of compromise and settlement. The notice was mailed on July 23, 1965 with a hearing on objections set for September 13, 1965. Adequate information and time were thus made available to anyone who wished to voice his objections to the agreement.

Under these conditions it appears to the court that a bar order is proper.

Pursuant to the terms of the agreement, the court appoints Bethuel M. Webster, of 1 Rockefeller Plaza, New York City, to administer the settlement.

We come now to the applications for fees and allowances by counsel for the plaintiffs and their accountants. The attorneys for plaintiffs have agreed that the maximum amount to be granted shall be $425,000 or 23% of the settlement figure.

Herman Odell, the attorney for the plaintiffs in the Fox action, has made application for fees in the amount of $300,000 plus disbursements of $6,280. He retained the accounting firm of Ferro, Berdon & Co. to assist him in the preparation of the case. This accounting firm has made application for fees in the amount of $50,000.

The firm of Malchman & Klied, attorneys for the plaintiffs in the Rudnick action, has made application for fees in the amount of $175,000 plus disbursements of $1,097.

The firm of Kaufman, Taylor, Kimmel & Miller, attorneys for plaintiffs in the Lazar action, has made application for fees in the amount of $150,000 plus disbursements of $4,321. This firm retained Richard Rothenberg and Robert Landy, accountants, to assist it in preparing the Lazar action. These accountants request fees in the sum of $15,000.

The requested allowances total $690,000 or a little more than 37% of the settlement figure.

 These are private lawsuits and the court should not entertain independent requests for allowances by the accountants retained by counsel for the parties without court approval. Their engagement was solely the result of counsel's determination of their requirements to prepare the case. As Chief Judge Ryan said in Derdiarian v. Futterman Corp., 63 Civ. 1367, 254 F. Supp. 617, S.D.N.Y., January 28, 1966:

> "It is the policy of this court not to award fees to accountants, particularly when no order was entered authorizing their employment * * * we feel that this is better treated as a disbursement to be made by the plaintiff's attorney."

Consequently, the court will not pass upon the requested allowances submitted by the accountants. Their compensation is a matter between them and respective counsel.

The affidavits, memoranda and exhibits submitted in support of the various applications by counsel measure more than a foot high. Most of the material submitted by each of the three counsel is in denigration of the efforts and contributions of the other two. The huge amount of time necessarily devoted to reading the submitted material could have been shortened considerably if each counsel had devoted himself solely to detailing what he had done, and the effect of his contribution to the overall settlement. The court must admit, however, that at times the wild throwing of charges and countercharges and specious arguments caused some humor to enter the picture.

The Fox action was filed first and was based on the "cash flow" theory to bottom recovery. This action, however, failed to name as defendants Berdon & Co., the accountants for the Corporation (no relation to the firm of accountants retained in the Fox action except that the Berdons are brothers), and the underwriters. The complaint in the Rudnick action followed, in which reliance was placed on the "loans and pledges" aspect of the claim, and both Berdon & Co. and the underwriters were named defendants. An amended complaint in the Fox action was then filed, which added the "loans and pledges" feature, and added the underwriters as defendants, but did not name the accountants Berdon & Co. Finally came the complaint in the Lazar action, which relied in the main on the "loans and pledges," and named the underwriters as defendants, but not the accountants Berdon & Co.

This recitation shows that the Rudnick action was different from the other actions in one interesting aspect. The accountants were there named as defendants and have made a financial contribution to the settlement of this action. This, however, is the main contribution of counsel for Rudnick. He was so anxious to proceed that he announced his readiness for trial at the first pretrial conference without having engaged in discovery-deposition proceedings, which are so important in the preparation and development of a case of this type. Furthermore, when defendants were afforded an opportunity to depose Rudnick, summary judgment in favor of one of the defendants in this action resulted. Lastly, the Rudnick complaint does not embrace the first prospectus, which covered 3,856,020 of the 4,371,020 shares involved here. The affidavit of services submitted by coun-

sel in this action admittedly is based on a hindsight allocation of time of 545 hours. He states:

"Counsel for plaintiffs in Rudnick did not keep time records. However, counsel has attempted to reconstruct time spent through work product and other available sources of information."

Counsel for Fox has also failed to keep detailed time records, either for himself or two associates, one of whom was admitted to the bar in 1964. Lump sum allocations of time to various facets of the litigation add up to a total of 1,932 hours. Counsel's great stress on evaluating his services rests on the asserted "cash flow" theory. He states that he never thought much of the "pledges and loans" theory, as developed by the SEC, and that the "cash flow" claim is what in the main created the fund. However, it is well to note that he subsequently amended his complaint after the filing of the Rudnick complaint, to embrace the "loans and pledges" basis of the claim. His preparation for trial was quite extensive and detailed.

Counsel for both Lazar and Rudnick assert that the "cash flow" theory had nothing to do with the settlement. In addition, counsel for Lazar claims that it was the only one that asserted a violation of section 12(2) of the Securities Act of 1933 as a claimed basis for recovery. Counsel for Lazar did not contribute nearly as much to the pretrial deposition-discovery proceedings as counsel in Fox. Lazar counsel has furnished a detailed statement indicating that they spent 1,800 hours in connection with the litigation.

It is necessary for counsel in litigation of this type to keep accurate time records. In In re Hudson & Manhattan R. R., 339 F.2d 114 (2d Cir. 1964), the court said:

"We wish to emphasize that any attorney who hopes to obtain an allowance from the court should keep accurate and current records of work done and time spent."

See also In re Wal-Feld Co., 345 F.2d 676 (2d Cir. 1965).

Hours spent may not be as important as other factors when the contingent nature of the fee is taken into consideration. Other factors that must be considered are the amount of recovery, the contribution of counsel to that recovery, the skill of counsel and his awareness of responsibilities to the court in the conduct of the litigation.

Taking all factors into consideration, and after reviewing all of the material submitted on this application for fees, the following allowances to include disbursements are made: Herman Odell, $160,000; Kaufman, Taylor, Kimmel & Miller, $75,000; Malchman & Klied, $50,000—a total of $285,000 or 16% of the settlement figure.

An application for allowance of counsel fees was received from Lewis Herman, attorney for Benjamin Bloch. His objection to the settlement has been overruled and the application for counsel fees is denied.

Settle judgment and order.