**GILLIGAN, WILL & CO., a partnership, and James Gilligan and William Will, Petitioners,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 117, Docket 25171.**

United States Court of Appeals Second Circuit.

Argued Jan. 15, 1959.

Decided June 3, 1959.

Francis J. Purcell, New York City (Townsend & Lewis, New York City, on the brief), for petitioners.

Daniel J. McCauley, Jr., Associate Gen. Counsel, Securities and Exchange Commission, Washington, D. C. (Thomas G. Meeker, Gen. Counsel, Joseph B. Levin, Asst. Gen. Counsel, and Richard Pearl, Washington, D. C., on the brief), for respondent.

Before MEDINA, LUMBARD and BURGER,* Circuit Judges.

LUMBARD, Circuit Judge.

The question for decision is whether Gilligan, Will & Co. and its partners, James Gilligan and William Will, were underwriters with respect to the distribution of Crowell-Collier Publishing Company securities and as such wilfully violated the Securities Act of 1933, as amended, 15 U.S.C.A. § 77a et seq., by acquiring and distributing debentures and common stock which were not registered. For reasons which are discussed below, this question turns on whether the issue was a "public offering" as those words are used in the Act, 15 U.S.C.A. § 77d.

For their activities with respect to these debentures and stock the Securities & Exchange Commission, pursuant to § 15 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o, instituted a proceeding to determine whether the petitioners had violated the 1933 Act and whether Gilligan, Will & Co.'s registration as a broker-dealer under the 1934 Act should be revoked. The facts were stipulated, a hearing was waived, and the Commission heard oral argument. It thereafter ordered that Gilligan, Will & Co. be suspended from membership in the National Association of Securities Dealers, Inc. for five days, and found that James Gilligan and William Will were each a cause of the order.

The partnership and the partners petition for a review of the Commission's order claiming that its action was arbitrary and capricious in four respects:

(1) that its finding that petitioners were underwriters with respect to 1955 and 1956 transactions in Crowell-Collier debentures and stock was not supported by substantial evidence; (2) that the findings of wilful violation of the registration provision was unsupported by substantial evidence; (3) that the suspension of Gilligan, Will & Co. was arbitrary, capricious and an abuse of discretion; and (4) that they were denied an impartial hearing because the Commission had predetermined the matter by a press release issued before the hearing.

We hold that there was substantial evidence to justify the findings and conclusions of the Commission that the issue was a public offering and that petitioners were underwriters, and we agree that the registrant's suspension for wilful violation was proper. As the petitioners proceeded to trial without claiming prejudice from the Commission's press release, applying for an adjournment of the hearing and determination, or otherwise presenting their claims of pre-judgment to the Commission, they are foreclosed from complaining of this now. Section 25(a), Securities Exchange Act of 1934, 15 U.S.C.A. § 78y. Accordingly, we affirm the Commission's order.

■ The principal and essential purpose of the 1933 Act is to protect investors by requiring registration with the Commission of certain information concerning securities offered for sale. A. C. Frost & Co. v. Coeur D'Alene Mines Corp., 1941, 312 U.S. 38, 40, 61 S.Ct. 414, 85 L.Ed. 500. For reasons which will be developed, the crucial provisions of law in this case are § 5 of the 1933 Act, 15 U.S.C.A. § 77e, which makes it unlawful for anyone, by any interstate communication or use of the mails, to sell or deliver any security unless a registration statement is in effect; and § 4(1), 15 U.S.C.A. § 77d(1), which exempts from this prohibition "transactions by any person other than issuer, underwriter, or dealer" and "transac-

---

\* Sitting by designation pursuant to 28 U.S.C. § 291(a).

tions by an issuer not involving any public offering." [1]

■■■ Since the Commission's proceeding was had on stipulated facts the only question is whether it was justified in drawing from them the inferences and conclusions of which the petitioners complain, principally that the petitioners were underwriters and that the issue was a public offering. To examine these inferences and conclusions we must state in some detail the facts concerning the issuance of the unregistered debentures and common stock of Crowell-Collier Publishing Company.

On July 6, 1955, Elliott & Company agreed with Crowell-Collier to try to sell privately, without registration, $3,000,000 of Crowell-Collier 5% debentures, convertible at any time into common stock at $5 a share, and the Elliott firm received an option on an additional $1,000,000 of debentures. Edward L. Elliott, a partner in Elliott & Company, advised Gilligan, one of the two partners of the registrant, Gilligan, Will & Co., of this agreement. He told Gilligan that Gilligan could purchase, but only for investment, as much of the $3,000,000 as he wished, with the exception of $500,000 which Elliott's wife was taking, and that the debentures not taken by Gilligan would be offered to certain friends of Elliott. Gilligan was told by Elliott that Crowell-Collier had "turned the corner" and was then operating on a profitable basis. Elliott also said that the attorneys for Crowell-Collier and his lawyers had stated that the placement was an exempt transaction. Gilligan agreed to purchase $100,000 of debentures for his own account. It does not appear that Gilligan had any information regarding Crowell-Collier and the debenture issue other than what Elliott told him as summarized above.

1. Section 77e in relevant part provides:
"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instrument of transportation, any such security for the purpose of sale or for delivery after sale.
\* \* \* \* \*
"(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."
Section 77d in relevant part provides:
"The provisions of section 77e of this title shall not apply to any of the following transactions:

"(1) Transactions by any person other than an issuer, underwriter, or dealer; transactions by an issuer not involving any public offering; or transactions by a dealer (including an underwriter no longer acting as an underwriter in respect of the security involved in such transaction), except transactions taking place prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter and transactions in a security as to which a registration statement has been filed taking place prior to the expiration of forty days after the effective date of such registration statement or prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter after such effective date, whichever is later (excluding in the computation of such forty days any time during which a stop order issued under section 77h of this title is in effect as to the security), and except transactions as to securities constituting the whole or a part of an unsold allotment to or subscription by such dealer as a participant in the distribution of such securities by the issuer or by or through an underwriter."

On August 10, 1955 the $100,000 debentures were delivered to Gilligan, Will & Co., which sent a letter to Crowell-Collier stating: "that said debentures are being purchased for investment and that the undersigned has no present intention of distributing the same."

Nevertheless, by August 10, 1955, almost half of the $100,000 of debentures had already been resold. Either on July 6 or July 7, 1955, Louis Alter, a member of the American Stock Exchange, agreed to buy $45,000 of the debentures. Gilligan also offered $10,000 to a friend and when this was not accepted he sold $5,000 to Michael D. Mooney, who had previously requested that amount of debentures and had been told that none were available; the remaining $5,000 debentures were placed in the registrant's trading account. In early September, when the securities were distributed, Gilligan, Alter and Mooney each signed a statement reading: "I hereby confirm to you that said debentures are being purchased for investment and that I have no present intention of distributing the same."

In May 1956, after Gilligan noticed that the advertising in Crowell-Collier magazines was not increasing, he decided to convert his debentures into common stock and to sell the stock. He advised Alter of his plans and on May 15, 1956 the registrant, Gilligan and Alter converted their debentures into common stock. Later in May they sold the stock at a profit on the American Stock Exchange. The stock had been listed on that Exchange since October 1955, and Gilligan became the specialist in the stock.

In May 1956 Gilligan, Will & Co. also purchased and participated in the sale of additional debentures by Crowell-Collier. Elliott told Gilligan that he was surrendering to Crowell-Collier his option on the remaining $1,000,000 of debentures, and that these debentures were to be sold at 160% of par, based on the stock's price at that time of $8 per share. The proceeds of the sale, Elliott stated, were to be used by Crowell-Collier in the ac-

quisition of certain television stations which would show a profit of $4,000,000 annually. Elliott also told Gilligan that Crowell-Collier would sell him, Elliott, 100,000 stock purchase warrants at 1¢ each, exercisable at $10 per share for five years. Gilligan agreed to take $150,000 face amount debentures and said he would see whether Alter was interested in taking any. After Alter indicated that he wanted $50,000 face amount, Gilligan advised Elliott that the total subscription would be $200,000. Gilligan did not inform Elliott of his and Alter's sales of stock obtained from the conversion of the debentures purchased in 1955.

On May 29, 1956 the registrant subscribed to $200,000 face amount debentures and issued to Alter a confirmation for $50,000 debentures which stated: "we have this day subscribed for your account and risk; over the counter as agents * * *" Alter immediately converted his debentures into stock. On the same day the registrant similarly confirmed $150,000 face amount debentures to a joint specialist's account maintained by it and one Lloyd E. Howard, which debentures were immediately converted into common stock.

In addition, on May 29, the registrant sent Crowell-Collier a letter signed by Will, confirming that $200,000 of debentures were purchased for investment with no present intention to distribute. Howard and Alter made similar representations on copies of the confirmations issued to them by the registrant.

Late in May 1956, Elliott informed Gilligan that $200,000 of debentures were still unsold, that it was necessary to sell these debentures to one party, and that if Gilligan could find a purchaser, Elliott would sell him 50,000 stock warrants at 1¢ each. Gilligan contacted Harry Harris and told him that he would split his warrants with him if he, Harris, could find a purchaser for the debentures. Harris interested Value Line Special Fund, Inc., and Gilligan told Harris to contact Elliott. On May 29, 1956, the Fund's representatives met

with Crowell-Collier's president, Paul Smith, and Harris and Elliott, and the Fund later agreed to purchase $200,000 face amount debentures and 15,000 warrants. To accommodate Elliott, Gilligan, Will & Co. as principal sent a confirmation, signed by Will, covering the sale of the debentures to the Fund.

Gilligan, Will & Co. received 50,000 warrants from Elliott, some of which were sold to the Fund and some of which were given to nominees of Harris and others, the 20,000 warrants given to others being subsequently returned to Elliott at his request.

Gilligan, Will & Co. sent Crowell-Collier two investment intention letters, in the usual form, one covering the Fund's purchase of debentures and the other covering the 50,000 warrants received by registrant. The Fund, at the request of Gilligan, Will & Co. signed letters of investment intent covering the debentures and the warrants.

Petitioners assert that they were not "underwriters" within the meaning of the exemption provided by the first clause of § 4(1). Since § 2(11), 15 U.S. C.A. § 77b(11) defines an "underwriter" as "any person who has purchased from an issuer with a view to * * * the distribution of any security" and since a "distribution" requires a "public offering," see H.R.Rep. No. 1838, 73d Cong., 2d Sess. (1934) at p. 41, the question is whether there was a "public offering." Petitioners, disclaiming any reliance on the exemption of the second clause of § 4(1) for "transactions by an issuer not involving any public offering," assert that whether there was a "distribution" must be judged solely by their own acts and intention, and not by the acts or intention of the issuer or others. In other words they claim that whether the total offering was in fact public, their purchases and resales may be found to be exempt on the ground that they were not underwriters if their own resales did not amount to a public offering.

In the view we take of this case we need not decide whether, if the petitioners had purchased with a view to only such resales as would not amount to a distribution or public offering, their acts would be exempt even though the issue was in fact a public offering. We find that the resales contemplated and executed by petitioners were themselves a distribution or public offering as the latter term has been defined by the Supreme Court, and we therefore find that petitioners were underwriters and that their transactions were not exempt under § 4(1).

In S. E. C. v. Ralston Purina Co., 1953, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494, the Supreme Court considered the exemptions provided by § 4(1). Two of its holdings are significant here. First, it held that an issuer who claims the benefit of an exemption from § 5 for the sale of an unregistered security has the burden of proving entitlement to it. The rationale of this result applies as well to a broker-dealer who claims the benefit of a similar exemption. We therefore find that the burden was upon the petitioners to establish that they were not underwriters within the meaning of § 4(1).

The Court also defined the standard to be applied in determining whether an issue is a public offering. It held that the governing fact is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information. 346 U.S. at pages 125–127, 73 S.Ct. at pages 984–985. The stipulation of facts here expressly states that the purchasers "were not supplied with material information of the scope and character contemplated by the Securities Act nor were the purchasers in such a relation to the issuer as to have access to such information concerning the company and its affairs." Such a stipulation, which from the additional stipulated facts, appears equally applicable to Gilligan, the registrant, Alter, Mooney and Mrs. Elliott, concedes the very proposition of which the petitioners had to establish the negative in order to prevail, and we therefore think it dispositive of the question

whether petitioners "purchased * * * with a view to * * * distribution."

Petitioners argue, however, that the definition of the Ralston Purina case is not exclusive, and that there is an exception to the standard there announced for cases in which the number of offerees or purchasers is small. In reliance on such a standard they assert that the stipulation discloses the existence of only four specific purchasers, and that therefore the Commission was bound to determine on this record that the petitioners' transactions were exempt because the issue was not public. We do not agree.

First, we think that the Ralston Purina case clearly rejected a quantity limit on the construction of the statutory term, and adopted instead the test set out above under which this issue was a public offering. It stated that "the statute would seem to apply to a 'public offering' whether to few or many," 346 U.S. at page 125, 73 S.Ct. at page 984, and cited with approval the dictum that "anything from two to infinity may serve: perhaps even one * * *" 346 U.S. 125, 73 S.Ct. 985 and note 11. Second, even were this not the case, and if a numerical exemption existed despite an admitted violation of the Purina standard, the stipulation adequately discloses that Gilligan well knew that the sales to Elliott's wife and to and through the registrant were not the only sales that were contemplated. It is stipulated that "Elliott advised Gilligan that * * * Elliott was * * * going to sell as much as was left to certain of his friends" after Gilligan took what he wanted of the $2,500,000 remaining after Elliott's wife took $500,000.

Thus these petitioners, who now assert an exemption based on the small number of resales that they contemplated and made, were admittedly aware that the actual placement involved many others. At the least, to establish entitlement to any numerical exemption in such circumstances, the petitioners would have to establish a reasonable and bona fide belief that the total number involved in the placement would remain within the exemption. Otherwise although a general public placement could be effected by a series of transfers to small numbers of buyers, each distributor would be entitled to an exemption on the ground that it transferred to only a small number of buyers. The stipulation reveals that without any knowledge of the actual number of sales then consummated or contemplated the petitioners effected what they now claim to be a harmless number of resales. Such a record does not require and would not justify a finding that the petitioners had sustained their burden of proving entitlement to an exemption based on the size of the contemplated distribution.

The petitioners separately attack the finding that the registrant was an underwriter on the ground that the stipulation reveals that Gilligan agreed with Elliott that Gilligan would take the $100,000 for his own account and thus it requires the conclusion that the registrant did not participate. But the stipulation also reveals that Will received the debentures on behalf of the registrant and also on its behalf issued an investment intention letter, and that $5,000 were placed in the firm trading account. On such facts the Commission was justified in concluding that the registrant participated in the acquisition and distribution of the unregistered issue.

The Commission also found that "The sales by Gilligan and registrant of the underlying common stock on the American Stock Exchange in May 1956, clearly constituted a public distribution." Petitioners contest this conclusion on the ground that since the conversion and sales occurred more than ten months after the purchase of the debentures the Commission was bound to find that the debentures so converted had been held for investment, and that the sales were therefore exempt under § 4(1) since made by a person other than an issuer, underwriter or dealer. Petitioners concede that if such sales were intended at the time of purchase, the debentures would not then have been held as investments; but it argues that the stipulation

reveals that the sales were undertaken only after a change' of the issuer's circumstances as a result of which petitioners, acting as prudent investors, thought it wise to sell. The catalytic circumstances were the failure, noted by Gilligan, of Crowell-Collier to increase its advertising space as he had anticipated that it would. We agree with the Commission that in the circumstances here presented the intention to retain the debentures only if Crowell-Collier continued to operate profitably was equivalent to a "purchased * * * with a view to * * * distribution"· within the statutory definition of underwriters in § 2(11). To hold otherwise would be to permit a dealer who speculatively purchases an unregistered security in the hope that the financially weak issuer had, as is stipulated here, "turned the corner," to unload on the unadvised public what he later determines to be an unsound investment without the disclosure sought by the securities laws, although it is in precisely such circumstances that disclosure is most necessary and desirable. The Commission was within its discretion in finding on this stipulation that petitioners bought "with a view to distribution" despite the ten months of holding.

It is unnecessary, in the light of our decision sustaining the findings of the Commission as to violations with regard to the 1955 debentures, separately to consider the violations of § 5 found by the Commission as to the issue in 1956. Finally, on the stipulation there is no doubt either that the Commission was justified in finding that the petitioners' acts were "wilful" within the meaning of § 15(b) of the Securities Exchange Act of 1934, see, e.g., Hughes v. S. E. C., 1949, 85 U.S.App.D.C. 56, 174 F.2d 969, 977, or that the penalty imposed was within the Commission's discretion, see, e.g., American Power & Light Co. v. S. E. C., 1946, 329 U.S. 90, 112, 67 S.Ct. 133, 91 L.Ed. 103.

■ The petitioners raise the additional objection that they were denied the kind of hearing which they are guaranteed by the due process clause of the Fifth Amendment and § 5 of the Administrative Procedure Act, 5 U.S.C.A. § 1004, in that the Commission prejudged their guilt in advance of the hearing. It is undisputed that the Commission issued a press release on August 12, 1957, three days after its order commencing these proceedings was issued, in which it stated that the brokers-dealers involved in the distribution of the unregistered Crowell-Collier debentures and stock had violated § 5 of the Securities Act of 1933. While the petitioners were not mentioned by name in the release, it is undisputed that it referred to them, among others.

We agree with the Commission that the failure of petitioners to assert the defect of prejudgment before the Commission once the release was available to them amounted to a waiver of the objection under § 25(a) of the 1934 Act, 15 U.S.C. § 78y, which provides that no objection to the Commission's orders shall be considered by an appellate court "unless such objection shall have been urged before the Commission" or unless there were "reasonable grounds" for failure to do so. No reason is given by the petitioners for their failure to object during the proceedings below.

The petitioners have relied here on the refusal of Commissioner Sargent to participate in the proceedings on the ground, which he stated in a separate opinion, that he had reached "a definitive conclusion of law upon findings of fact on August 12, 1957, which antedated the institution of these proceedings," as a result of his participation in the release. While we of course express no opinion on the correctness of Commissioner Sargent's assertion that § 5 of the Administrative Procedure Act does not permit such participation as occurred here by the Commission itself in both the release and subsequent proceedings, we think it appropriate to express our doubts whether such participation was either necessary or desirable.

Apart from § 5 and the restrictions it may impose, the Commission's reputa-

tion for objectivity and impartiality is opened to challenge by the adoption of a procedure from which a disinterested observer may conclude that it has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it. There would appear to be no such conflict between the Commission's duty to inform the public and its duty to prosecute as would necessitate the use of press releases of the kind here questioned.

The order of the Commission is affirmed.