**AMERICAN MEDICAL ASSOCIATION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**CONNECTICUT STATE MEDICAL SOCIETY and New Haven County Medical Association, Inc., Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

Nos. 995, 1050, Dockets 79–4214, 79–4226.

United States Court of Appeals, Second Circuit.

Argued May 2, 1980.

Decided Oct. 7, 1980.

Newton N. Minow, Chicago, Ill. (Sidley & Austin, Chicago, Ill., Jack R. Bierig, Chicago, Ill., on brief; Bernard D. Hirsh, B. J. Anderson, Chicago, Ill., of counsel), for petitioner, American Medical Ass'n.

Linda L. Randell, New Haven, Conn. (Wiggin & Dana, New Haven, Conn. William J. Doyle, New Haven, Conn., on brief), for petitioners Connecticut State Medical Soc. and New Haven County Medical Ass'n., Inc.

Howard E. Shapiro, Deputy Gen. Counsel, F. T. C., Washington, D. C. (Michael N. Sohn, Gen. Counsel; March Coleman, L. Barry Costilo, David M. Fitzgerald, Linda A. Heary, Brenda M. Hull, Leslie R. Melman, Washington, D. C., on brief), for respondent, Federal Trade Commission.

Before MANSFIELD and TIMBERS, Circuit Judges, and BONSAL, District Judge.*

BONSAL, District Judge:

The American Medical Association ("AMA"), the Connecticut State Medical Society ("CSMS"), and the New Haven County Medical Association, Inc. ("NHCMA") petition for review of a Cease and Desist Order issued by the Federal

* Of the United States District Court for the Southern District of New York, sitting by designation.

Trade Commission ("FTC") against AMA on October 12, 1979 (FTC Dkt. No. 9064). The Order requires AMA to cease and desist from promulgating, implementing, and enforcing restraints on advertising, solicitation, and contract practices by physicians and on the contractual arrangements between physicians and non–physicians. The FTC found that ethical standards issued by AMA were in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). The FTC cross–petitions for enforcement of its Order.

## THE FACTS

AMA is an Illinois not–for–profit corporation first incorporated in 1897. Its membership is comprised of physicians, osteopaths and medical students, but most of its members are practicing physicians. As of December 31, 1974, 52.6% of the licensed physicians in the United States were members of AMA. AMA's legislative body is its House of Delegates. Enactments of the House of Delegates become the official policy of AMA. In 1957 the House of Delegates approved the "Principles of Medical Ethics" consisting of a preamble and ten paragraphs.[1] Interpretation of the "Principles of Medical Ethics" is made by AMA's Judicial Council, a committee of the House of Delegates, and the decisions of the Judicial Council are set forth in the AMA publication, *Opinions and Reports.* The Judicial

1. PRINCIPLES OF MEDICAL ETHICS

PREAMBLE

These principles are intended to aid physicians individually and collectively in maintaining a high level of ethical conduct. They are not laws but standards by which a physician may determine the propriety of his conduct in his relationship with patients, with colleagues, with members of allied professions, and with the public.

SECTION 1

The principle objective of the medical profession is to render service to humanity with full respect for the dignity of man. Physicians should merit the confidence of patients entrusted to their care, rendering to each a full measure of service and devotion.

SECTION 2

Physicians should strive continually to improve medical knowledge and skill, and should make available to their patients and colleagues the benefits of their professional attainments.

SECTION 3

A physician should practice a method of healing founded on a scientific basis; and he should not voluntarily associate professionally with anyone who violates this principle.

SECTION 4

The medical profession should safeguard the public and itself against physicians deficient in moral character or professional competence. Physicians should observe all laws, uphold the dignity and honor of the profession and accept its self–imposed disciplines. They should expose, without hesitation, illegal or unethical conduct of fellow members of the profession.

SECTION 5

A physician may choose whom he will serve. In an emergency, however, he should render service to the best of his ability. Having undertaken the care of a patient, he may not neglect him; and unless he has been discharged he may discontinue his services only after giving adequate notice. He should not solicit patients.

SECTION 6

A physician should not dispose of his services under terms or conditions which tend to interfere with or impair the free and complete exercise of his medical judgment and skill or tend to cause a deterioration of the quality of medical care.

SECTION 7

In the practice of medicine a physician should limit the source of his professional income to medical services actually rendered by him, or under his supervision, to his patients. His fee should be commensurate with the services rendered and the patient's ability to pay. He should neither pay nor receive a commission for referral of patients. Drugs, remedies or appliances may be dispensed or supplied by the physician provided it is in the best interests of the patient.

SECTION 8

A physician should seek consultation upon request; in doubtful or difficult cases; or whenever it appears that the quality of medical service may be enhanced thereby.

SECTION 9

A physician may not reveal the confidences entrusted to him in the course of medical attendance, or the deficiencies he may observe in the character of patients, unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or of the community.

SECTION 10

The honored ideals of the medical profession imply that the responsibilities of the physician extend not only to the individual, but also to society where these responsibilities deserve his interest and participation in activities which have the purpose of improving both the health and the well–being of the individual and the community.

Council also is responsible for reviewing adjudications of state societies.

CSMS is the state medical society in Connecticut. A number of state medical societies originally formed AMA and membership in a state medical society is a condition to membership in AMA. 82% of Connecticut physicians are members of CSMS.

NHCMA is a local medical association. 71% of New Haven physicians are members of NHCMA. A New Haven physician must be a member of NHCMA in order to become a member of CSMS.

On December 19, 1975, the FTC filed a complaint against AMA, CSMS, and NHCMA charging them with restricting the ability of their members to advertise for and solicit patients and with interfering with the ability of their members to engage in contractual relationships with non–physicians. CSMS and NHCMA were included in the complaint on the ground that the state societies and local associations follow the lead of AMA and because the FTC believed that there was a conspiracy between AMA and the state societies and local associations to restrict competition among physicians through ethical limitations on advertising, solicitation and contractual relationships. Such restriction, in the view of the FTC, violated Section 5 of the Federal Trade Commission Act.

The FTC held hearings between September 7, 1977 and May 5, 1978. On November 13, 1978, the administrative law judge, Ernest G. Barnes, issued his Initial Decision finding that the ethical practices complained of violated Section 5 of the Federal Trade Commission Act. On appeal of the administrative law judge's decision to the FTC, the Commission affirmed and issued its Opinion and Final Order on October 12, 1979 (FTC Dkt. No. 9064) ("FTC Opinion"). The Final Order requires AMA to cease and desist from promulgating, implementing and enforcing restraints on advertising, solicitation and contract practices by physicians and on the contractual arrangements between physicians and non–physicians. Exception is made with respect to "false or deceptive" practices, and the Order provides that nothing contained therein prohibits AMA from

"formulating, adopting, disseminating to its constituent and component medical organizations and to its members, and enforcing reasonable ethical guidelines governing the conduct of its members with respect to representations, including unsubstantiated representations, that would be false or deceptive within the meaning of Section 5 of the Federal Trade Commission Act, or with respect to uninvited, in–person solicitation of actual or potential patients, who, because of their particular circumstances, are vulnerable to undue influence."

The Order also requires AMA to disassociate itself from any state or local society that violates the terms of the Order.

## PRELIMINARY ISSUES

Two preliminary issues have been raised by the petitioners:[2] (1) that the FTC lacks jurisdiction over the petitioners, and (2) that Chairman Michael Pertschuk should have been disqualified because he had demonstrated through his public statements that he had prejudged key issues in the proceeding.[3]

*Jurisdiction over Petitioners*

Petitioners contend that as nonprofit corporations, they are not subject to the jurisdiction of the FTC as set forth in Section 4

---

**2.** The Order herein does not require, at least directly, that CSMS or NHCMA petitioners cease and desist from doing anything. However, both petitioners contend that they are proper parties to this proceeding since they were named as respondents in the agency action below, adverse findings were made against them by the FTC, and they are affected by the Final Order. The FTC does not oppose their participation in this proceeding, and suggests that they may be treated as intervenors. At the same time, CSMS and NHCMA do not appear to be seeking relief independent from that sought by AMA. In view of these factors, we assume without deciding that CSMS and NHCMA are proper parties to this petition for review.

**3.** There appears to be no dispute that the practices complained of affect interstate commerce.

of the Federal Trade Commission Act, 15 U.S.C. § 44, which defines "corporation" to include any entity "organized to carry on business for its own profit or that of its members." The record satisfies us that the petitioners serve both the business and non–business interests of their member physicians. As long ago as 1902, AMA amended its Articles of Incorporation to provide that one of its objectives was to "safeguard the material interests of the medical profession." The administrative law judge found that AMA actively lobbies for legislation that it believes may be for the profit of its members. He also found that AMA, in a variety of ways, including advice on insurance plans, renders business advice to its members.

■ The business aspects of the activities of the petitioners fall within the scope of the Federal Trade Commission Act even if they are considered secondary to the charitable and social aspects of their work. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788, 95 S.Ct. 2004, 2013–14, 44 L.Ed.2d 572 (1975); *FTC v. National Commission on Egg Nutrition*, 517 F.2d 485, 488 (7th Cir. 1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976).

Petitioners' reliance upon *Community Blood Bank of Kansas City Area, Inc. v. FTC*, 405 F.2d 1011 (8th Cir. 1969), is misplaced. That case involved a blood bank run as a charitable organization. However, the court recognized that "Congress did not intend to provide a blanket exclusion of all non–profit corporations . . . ." *Id.* at 1017.

The FTC fully considered the facts bearing on whether the petitioners' activities included their business aspects. *See FTC v. Ernstthal*, 607 F.2d 488, 490 (D.C.Cir.1979). In addition, the Cease and Desist Order involves only advertising, solicitation and contractual relationships. We therefore conclude that the evidence in the record sustains the jurisdiction of the FTC.

*Disqualification of Chairman Pertschuk*

During the FTC proceeding, the petitioners moved to disqualify Chairman Pert-

schuk on the ground that he had prejudged the merits of this proceeding before it came before the Commission. In support of this contention, petitioners cite a speech made by Chairman Pertschuk before the American Enterprise Institute's Occupational Licensure Conference on February 22, 1979 concerning the misuse of licensing procedures to restrain competition. However, no mention of this case was made, nor was there any reference to physicians as a group.

Chairman Pertschuk prepared a statement for presentation to the Subcommittee on Health and Scientific Research, of the United States Senate, on October 10, 1977, which was never presented because of the cancellation of the hearings. This statement discussed the medical profession in the context of a multitude of issues in the field of health care. The lone reference to this proceeding was that a complaint had been filed challenging portions of the Code of Ethics of AMA that "may" unduly restrain dissemination of information about physicians' services. He stated that "[s]ince these matters are currently in litigation, I hope you will understand why it would not be appropriate for me to comment further about them."

Petitioners also refer to a speech made by Chairman Pertschuk before the Consumer Assembly on January 19, 1978 with respect to food and health care costs. He mentioned the trial of this case as one of the many activities being undertaken by the FTC in the medical care field.

■ We do not find that Chairman Pertschuk's statements on these occasions, considered in their entirety, *Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 80 (10th Cir. 1972), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974), approach the appearance of impropriety, the test applied in *Cinderella Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 590–91 (D.C.Cir. 1970).[4] Nor do we find that Chairman

4. Neither *Cinderella* nor *Texaco, Inc. v. FTC*, 336 F.2d 754, 760 (D.C.Cir.1964), are of assistance to petitioners, since in both of those cases a commissioner made statements as to specific

Pertschuk prejudged the facts and the law in this case before hearing it. *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 468 (2d Cir.), *cert. denied*, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959). At most, the public statements brought to our attention by the petitioners indicate that the chairman was informing the Congress and the public as to FTC's activities and policies in general, *FTC v. Cement Institute*, 333 U.S. 683, 700–01, 68 S.Ct. 793, 803, 92 L.Ed. 1010 (1948), including those in the medical field. We do not find these statements to be grounds for disqualification.

## LIABILITY

■ At the time the FTC filed its complaint in this action on December 19, 1975, AMA's authoritative interpretation of the ethical restraints that are the subject of this action were contained in the 1971 edition of *Opinions and Reports*.[5] Both the administrative law judge and the Commission detailed numerous examples of applications of the ethical restraints evidencing an anticompetitive purpose and effect. These included restrictions upon the dissemination of price information, bans upon advertisement of individual physicians' services and alternative forms of medical care, and restraints upon particular forms of advertising. The Commission concluded that this evidence "is susceptible to no interpretation other than that ethical principles of the medical profession have prevented doctors and medical organizations from disseminating information on the prices and services they offer, severely inhibiting competition among health care providers." FTC Opin-

ion, at 29. The Commission further found that AMA's contract practice restrictions had the purpose and effect of restraining competition by group health plans, hospitals, and similar organizations, and restricted physicians from developing business structures of their own choice. *Id.* at 41–43. Based upon our own review of the record, we conclude that these findings are supported by substantial evidence. *See* 15 U.S.C. § 45(c).

Petitioners contend that the ethical guidelines are merely to assist the state societies and the local associations; in other words, that they are advisory only. They point out that no formal action has been taken by AMA in these matters since 1955 in the appeal of Ben E. Landess where Dr. Landess was charged with "the indirect solicitation and procurement of patients by advertising." Dr. Landess was the Medical Director of the Jamaica Medical Group, which had a contract with the Health Insurance Plan of Greater New York, Inc. ("H.I.P."), which offers a form of prepaid medical coverage in the State of New York. H.I.P. advertises directly to the public. The Judicial Council of AMA adopted the report of the Queens County Medical Society that no action be taken against Dr. Landess. The Judicial Council went on to say that since the quality of its advertising is not in issue and "since Dr. Landess had nothing to do with the preparation or distribution of the advertising, it is our opinion contrary to that of the state and county medical societies that the conduct of Dr. Landess does not violate the ethic relating to solicitation and advertising." Joint App. at 425.

facts yet to be resolved in the respective proceedings. Indeed, the *Texaco* court specifically noted that since it could "not expect a Trade Commissioner to be neutral on anti–monopoly policies," such an adjudicator could be permitted to hear a case, even "after he had expressed an opinion as to whether certain types of conduct were prohibited by law." 336 F.2d at 760. As we have noted in a somewhat different context, "it is not improper for members of regulatory commissions to form views about law and policy on the basis of their prior adjudications of similar issues which may influence them in deciding later cases." *Rombough v. FAA*, 594 F.2d 893, 900 (2d Cir. 1979).

5. Sixteen months after the complaint was filed, AMA revised its *Opinions and Reports*. Petitioners contend that any violations that may have existed earlier were corrected by the 1977 version. We do not believe the FTC was required to amend its complaint at that point. However, AMA's post–complaint revision properly may be considered on the issue of the remedy provided in the Final Order. *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 47, 80 S.Ct. 503, 513, 4 L.Ed.2d 505 (1960); *United States v. Oregon Medical Society*, 343 U.S. 326, 332, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952).

In any event, the issue here is not whether AMA has specific power or authority over the state societies and local associations or, if it has, whether it exercises it. The issue is whether these groups have acted in concert to effectuate restraints on advertising and solicitation in violation of the Federal Trade Commission Act. It is this concerted activity for a common purpose that constitutes the violation. *FTC v. Cement Institute*, 333 U.S. at 709, 68 S.Ct. at 807. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 692–96, 98 S.Ct. 1355, 1365–68, 55 L.Ed.2d 637 (1978).

The record satisfies us that AMA intended and expected that the state and local medical groups would enforce the limitations on advertising and solicitation and, indeed, advised them as to how to do it. In other words, AMA limitations "provided the impetus" for the actions taken, and individual physicians "could be expected to comply in order to assure that they did not discredit themselves by departing from professional norms, and perhaps betraying their professional oaths." *Goldfarb v. Virginia State Bar*, 421 U.S. at 791 n.21, 95 S.Ct. at 2015.

### REMEDY

The Final Order of the Commission consists of six Parts, the first two being the Cease and Desist Orders, and the third and fourth being the notice and disaffiliation provisions. The Final Order is directed only to AMA, and not to CSMS or NHCMA.

Part I of the Order directs AMA to cease and desist from (A) restricting the advertising of services, facilities, or prices by physicians or organizations with which physicians are affiliated; (B) restricting the operation of any organization that offers physicians' services to the public, by means of representations concerning the ethical propriety of medical service arrangements that limit the patients' choice of a physician; and (C) inducing any physician or nongovernmental medical organization to take any of the prohibited restrictive actions. Part I expressly excludes from its prohibitions the dissemination by AMA of reasonable ethical guidelines concerning false and deceptive advertising and solicitation.

Part II of the Order directs AMA to cease and desist from (A) restricting or interfering with the consideration offered or provided physicians in return for the sale or distribution of their professional services; (B) restricting any organization that offers physicians' services by means of representations concerning the ethical propriety of medical service arrangements that limit the patients' choice of a physician; (C) restricting participation by non–physicians in the ownership or management of such organizations; and (D) inducing physicians or any organization from taking any of the actions prohibited by Part II.

Part III of the Order requires AMA in any proceeding involving violations of its ethical standards to provide (A) reasonable notice, (B) a hearing, and (C) written findings and conclusions.

Part IV of the Order requires AMA to (A) give written notice of the Order to its members and affiliate societies; (B) provide all new members and affiliate societies with a copy of the Order for a period of ten years; (C) remove from all of its publications and policy statements any provisions inconsistent with the Order; (D) require that all affiliate organizations, as a condition of affiliation, agree to adhere to the Order; and (E) disaffiliate for one year any constituent organization that engages in any act or practice prohibited by the Order.

*Post–Complaint Activities of AMA*

Petitioners contend that the revisions of the ethical standards contained in the 1977 *Opinions and Reports* obviate any need to enter the Order herein. However, this does not constitute grounds for denying enforcement of an FTC order, *see, e. g., Fedders Corp. v. FTC*, 529 F.2d 1398, 1403 (2d Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976), especially since the publication of the revisions occurred "only *after* the filing of the FTC complaint." *Great Atlantic & Pacific Tea Co. v. FTC*, 557 F.2d 971, 988 (2d Cir. 1977) (emphasis in original), *rev'd on other grounds*, 440 U.S.

69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979). In any event, the Commission can properly find, as it did here,[6] that the revisions were insufficient.

■ Additionally, it is not clear that the 1977 revisions rescinded prior ethical standards.[7] AMA has never announced to its members or affiliate societies that the 1971 ethical standards are no longer in effect. Moreover, nothing in the 1977 version of the *Opinions and Reports* indicates that it was intended to disavow prior standards. Rather, it refers with approval to the "long standing policy of the Judicial Council on advertising and solicitation by physicians.", By referring to the established policies, AMA indicated that its positions may not have changed and that the restraints, "if abandoned at all, may be resumed." FTC Opinion, at 57. *See SCM Corp. v. FTC*, 565 F.2d 807, 813 (2d Cir. 1977).[8] Finally, it is well established law that it is within the discretion of the FTC to determine whether an order is "necessary to cope with the unfair practices found." *FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 392, 85 S.Ct. 1035, 1046, 13 L.Ed.2d 904 (1965).[9] We have determined that the FTC considered the changes and rationally assessed their significance in concluding that a cease and desist order was warranted. *See SCM Corp. v. FTC*, 565 F.2d at 812. *See also FTC v. National Lead Co.*, 352 U.S. 419, 429, 77 S.Ct. 502, 509, 1 L.Ed.2d 438 (1957).

On July 22, 1980, AMA's House of Delegates adopted a new version of the *Principles of Medical Ethics*. The most notable change is the removal of the ban on "solicitation" previously found in Section 5 of the *Principles*. The 1980 *Principles* instead require a physician to deal "honestly," to expose doctors "deficient in character or competence," and "to respect the rights . . . of other health professionals."

The elimination of the ban on solicitation which appeared in the 1957 version of the *Principles* reflects a significant and commendable effort to comply with the terms of the FTC order here under review. AMA does not, however, concede any legal obligation to make such changes, since it still denies any involvement in the unlawful restraints found by the FTC.

■ The language of the 1980 *Principles* is general and imprecise in nature. Moreover, the various written interpretations of the 1957 *Principles* previously promulgated by AMA remain in effect. In the absence of any interpretation of the 1980 *Principles* in AMA's *Opinions and Reports*, we cannot find that the FTC's claims are moot.

*First Amendment*

■ Petitioners contend that Part II of the Cease and Desist Order constitutes a prior restraint upon speech and impermissibly interferes with the right to freedom of

**6.** For example, the ban on "solicitation" in the "Principles of Medical Ethics" was left unchanged, and the definition of that term incorporates many of the catchwords of earlier restraints. One instance of this is the retained condemnation of "self–laudatory" advertisements, even if fully accurate. In addition, the list of "accepted local media" fails to include newspapers, radio, or television. Publication of fees is mentioned only in connection with "reputable directories."

**7.** The record is mixed with regard to the impression of the average physician regarding the effect of the 1977 edition of *Opinions and Reports* on earlier versions. One witness testified that it was well accepted in the medical community that publication of a new edition rescinds previous editions. Other evidence, however, indicated that pre–1977 standards are still viewed as binding by physicians.

**8.** In view of our finding of other substantial evidence to support the remedial order, we need not address the question whether the administrative law judge properly rendered an adverse finding against AMA for failure to comply with a subpoena *duces tecum*.

**9.** AMA in its reply brief urges comparison with the FTC's actions regarding veterinary organizations, in which the agency withdrew proposed rules concerning veterinary advertising as a result of voluntary reforms on the part of those organizations. Federal Trade Commission, News Summary (April 11, 1980). However, we feel that this example cogently illustrates the limits of our review in cases of this nature: It is up to the FTC to take recognition of genuine, voluntary reform by withdrawing formal proceedings when within its discretion it sees fit to do so.

association under the First Amendment. We disagree. The FTC determined that various restrictions which AMA imposed upon contract practices of physicians violated the FTC Act. These included ethical restraints upon so–called "closed panel" arrangements, upon the consideration paid physicians by health care organizations, and upon physicians' arrangements with non–physicians. By its terms,[10] the Order applies solely to "ethical" restraints, and thus does not affect any speech or other First Amendment rights except insofar as it applies to statements officially condemning contract practices. "Just as an injunction against price fixing abridges the freedom of businessmen to talk to one another about prices, so too the injunction in this case must restrict [AMA's] range of expression on the ethics of [contract practices of physicians]." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 697, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978). *Cf. California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972) (right to freedom of association does not include the right to violate the law).

*Overbreadth and Vagueness*

Petitioners assert that the proviso at the end of Part I, which permits AMA to adopt "reasonable ethical guidelines governing the conduct of its members with respect to representations, including unsubstantiated representations, that would be false or deceptive within the meaning of Section 5 of the Federal Trade Commission Act," is overbroad and vague. The proviso was inserted in the Final Order at the request of AMA because of the Commission's "conviction that the AMA has a valuable and unique role to play with respect to deceptive advertising and oppressive forms of solicitation by physicians." FTC Opinion, at 58. AMA asks that it be granted more leeway in determining what kinds of claims are deceptive and misleading without the chilling effect that the threat of fines and penalties could have on its regulation of false and deceptive advertising. The Commission recognizes the " 'special role' of organized medicine . . . [that] necessarily confers on AMA a measure of discretion to develop 'principles of conduct.' " FTC Brief at 109, *quoting Bates v. State Bar of Arizona*, 433 U.S. 350, 384, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810 (1977). In view of the foregoing, we will amend the proviso by inserting the words "respondent reasonably believes" so that the concluding paragraph of Part I will read as follows:

"Nothing contained in this Part shall prohibit respondent from formulating, adopting, disseminating to its constituent and component medical organizations and to its members, and enforcing reasonable ethical guidelines governing the conduct of its members with respect to representations, including unsubstantiated representations, that *respondent reasonably believes* would be false or deceptive within the meaning of Section 5 of the Federal Trade Commission Act, or with respect to uninvited, in–person solicitation of actual or potential patients, who, because of their particular circumstances, are vul-

---

10. The relevant provisions of the Order require AMA to cease and desist from:

A. Restricting, regulating, impeding, advising on the ethical propriety of, or interfering with the consideration offered or provided to any physician in return for the sale, purchase or distribution of his or her professional services;

B. Restricting, interfering with, or impeding the growth, development or operations of any entity that offers physicians' services to the public, by means of any statement or other representation concerning the ethical propriety of medical service arrangements that limit the patient's choice of a physician;

C. Restricting, interfering with, or impeding the growth, development or operations of any entity that offers physicians' services to the public, by means of any statement or other representation concerning the ethical propriety of participation by non–physicians in the ownership or management of said organization; and

D. Inducing, urging, encouraging, or assisting any physician, or any medical association, group of physicians, hospital, insurance carrier or any other non–governmental organization to take any of the actions prohibited by this Part.

nerable to undue influence." [11] (modification emphasized)

■ Additionally, petitioners contend that Part II–A of the Order requires AMA to cease and desist from "advising on the ethical propriety of, or interfering with the consideration offered or provided to any physician in return for the sale, purchase or distribution of his or her professional services." AMA points out that this provision is so broad as to impinge upon valid activity such as professional peer review of the fee practices of physicians. In apparent recognition of this and mindful of Judge Wisdom's caveat that an FTC order "should not be drawn so broadly that it will cover legitimate practices," *Cotherman v. FTC*, 417 F.2d 587, 596 (5th Cir. 1969), the Commission requests us to modify clause II–A of the Order to add the words "in any contract with any entity that offers physicians' services to the public" following the word "physician." This modification clarifies the meaning of the Order, especially in light of the administrative record herein. *See, e. g., Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 215 n.2 (9th Cir. 1979); *National Commission on Egg Nutrition v. FTC*, 570 F.2d 157 at 163 (7th Cir). However, in view of AMA's contention in its reply brief that the Order is still overbroad, we will further modify the Order by adding the words "except for professional peer review of fee practices of physicians." Thus, the clause, as modified, will read:

> "Restricting, regulating, impeding, advising on the ethical propriety of, or interfering with the consideration offered or provided to any physician *in any contract with any entity that offers physicians' services to the public,* in return for the

sale, purchase, or distribution of his or her professional services, *except for professional peer review of fee practices of physicians . . . .*" (modifications emphasized)

### The Disaffiliation Provision

■ Part IV of the Order requires AMA to disaffiliate for one year any state or local medical society that engages in acts or practices that would violate the Order if engaged in by AMA, and requires as a condition to affiliation that the state and local societies agree to adhere to the provision of the Order. Petitioners contend that this violates due process. However, this provision finds support in *National Society of Professional Engineers v. United States*, 435 U.S. at 697, 98 S.Ct. at 1367. The Order does not violate AMA's right to due process since it bears a reasonable relationship to the unlawful practices found to exist. *See, e. g., Jacob Siegel Co. v. FTC*, 327 U.S. 608, 613, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946). *See also United States v. International Boxing Club of New York, Inc.*, 171 F.Supp. 841, 842 (S.D.N.Y.1957), *aff'd* 358 U.S. 242, 245, 79 S.Ct. 245, 247, 3 L.Ed.2d 270 (1959). The Commission "must be allowed effectively to close all roads to the prohibited goal, so that its orders may not be by-passed with impunity," *FTC v. Ruberoid Co.*, 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952), by the state and local medical societies.[12]

The Final Order of the FTC is MODIFIED as indicated herein. As so modified, the Order is ENFORCED.

---

11. In addition, we refer petitioners to the opinion of the FTC herein, in which they are provided certain guidelines, to wit, where ads merely state the price of routine and standardized services, there is little need for further ethical restrictions to prevent deception; where restrictions are justified, they should be reasonably related to goal of preventing deception; and across–the–board bans to broad categories of representations, or general restrictions applicable to any representation made through a specific medium, are highly suspect. FTC Opinion, at 59.

12. AMA cannot claim, as it attempts to do, that the disaffiliation provisions of the Order contravene Fed.R.Civ.P. 65(d), since that rule is inapplicable to agency orders. Moreover, there are no specific contempt proceedings that AMA's constituent societies need be protected from since they are not bound by any FTC order. *See Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126 (2d Cir. 1979).

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent for the reason that the steps promptly taken by the American Medical Association to modify and up–date its ethical standards after the Supreme Court's decision in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)–revisions that were commenced prior to the FTC's initiation of the present proceeding–satisfy me that the Commission proceeding has been unjustified, unnecessary, and a waste of administrative and judicial resources. In essence the Commission's order, as somewhat watered down by the majority opinion here, is based on outdated facts that long since have ceased to exist. It merely requires the Association to do what it is doing anyway and prohibits it from doing what it is not doing. Notwithstanding the mootness of the issues and the absence for years of "a reasonable likelihood that the past wrong–doing will recur," *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977), the Commission insisted on pressing for its pound of flesh. In my view the FTC is engaged in the futile business of beating a dead horse.

Before proceeding to the merits I agree that the Commission had jurisdiction over the subject matter pursuant to §§ 5(a)(2) and 4 of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a)(2) and 44.[1] However, I cannot agree with the majority that such jurisdiction exists whenever the business interests of associations are "secondary to the charitable and social aspects of their work," which would confer jurisdiction

whenever a non–profit organization serves *any* business interest.[2] Although trade associations, which are primarily vehicles for the pecuniary gain of their members, fall within the definition of § 4 of the Act, *FTC v. National Commission on Egg Nutrition*, 517 F.2d 485, 488 (7th Cir. 1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976), professional organizations were not discussed in the legislative history of the statute and jurisdiction over nonprofit organizations was denied by Congress, see H.R.Rep. No. 95–339, 95th Cong., 1st Sess. 120 (1977). In view of this history the appropriate test in my view would be whether the association engages in a substantial amount of activity for the pecuniary gain of its members. Where its activities designed to help its members' economic status are purely incidental or *de minimis* in comparison with the organization's nonremunerative activities, jurisdiction does not exist.

However, the Association's business–related activities are sufficient to bring it within the FTC's jurisdiction under even this quantitative test. Its lobbying efforts and advice on office and business practices–all designed to furnish assistance of economic value to its members–form a substantial part of its activities. The Association therefore bears a closer resemblance to a trade organization than to a strictly fraternal, scientific or charitable association.

I also agree, although somewhat *dubitante*, that prior statements of Chairman

1. Under § 5(a)(2) of the FTC Act, 15 U.S.C. § 45(a)(2), provides in pertinent part:

   "The Commission is empowered and directed to prevent ... corporations ... from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce."

   Section 4 of the Act, 15 U.S.C. § 44, defines "corporation" as:

   "any company, trust, so–called Massachusetts trust, or association, incorporated or unincorporated, which is organized to carry on business for its own profit or that of its members."

2. The decisions cited by the majority do not support the proposition that a non–profit association's engagement in any business activity

secondary to its charitable and social work confers jurisdiction on the FTC. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), arose under the Sherman Act, which has no jurisdictional limitations as does the FTC Act. The Sherman Act, unlike the FTC Act, contains no provision excluding non–profit organizations from its coverage. In *FTC v. Ernstthal*, 607 F.2d 488 (D.C. Cir.1979), the FTC had commenced an investigation. When its jurisdiction was challenged, the court merely held that since the question of whether there was jurisdiction turned on the activities of the organization, which could only be ascertained in the investigation, it was too early for the court to rule one way or the other on the jurisdictional issue.

Michael Pertschuk of the Commission, who participated in the oral argument, deliberations and decision in this case, did not call for his recusal or disqualification on the ground that he had "in some measure adjudged the facts as well as the law" of the case. *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 469 (2d Cir.), *cert. denied*, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959). See also *Cinderella Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 591 (D.C.Cir. 1970). Although an FTC Commissioner may form and express general views about law and policy, see *FTC v. Cement Institute*, 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010, 1035 (1948); *Rombough v. Federal Aviation Administration*, 594 F.2d 893, 900 (2d Cir. 1979), Chairman Pertschuk's statements here came extremely close to the line of prejudgment. For instance, in a prepared statement dated October 10, 1977, which was not given, he said:

> "While it would probably be excessive to say that the fox is guarding the chicken coop, it is undeniable that a great many critical judgments in this field are being made by persons with a direct economic stake in particular outcomes.... The vast majority of physicians and their organizations sincerely believe that they are acting in the public interest. Yet this is not enough. To be genuinely well served, the public must have assurance that those in control are responsive to consumer needs."

Although this and similar statements have the earmarks of prejudgment, see *Cinderella Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 589–90 (D.C.Cir.1970); *Texaco v. FTC*, 336 F.2d 754, 759–60 (D.C. Cir.1964), I am willing in this instance to give the speaker the benefit of the doubt.

Turning to the merits, it was not until the Supreme Court's June 16, 1975, decision in *Goldfarb, supra*, that the Association knew that it was subject to the provisions of the Sherman Act. It is undisputed that it promptly instituted on its own a review

of its "*Principles of Medical Ethics*," which had been approved in 1957 by its House of Delegates, and its interpretations of these principles for its members, which had been published in 1971 in a statement of *Opinions and Reports*. The purpose (and in my view, the effect) of the review was to bring its activities in compliance with antitrust requirements. The review led to the Association's issuance on April 9, 1976, of a revised statement of the Principles and in March, 1977, of a new edition of the *Opinions and Reports*. It is clear that the Association was already engaged in its bona fide revision of its ethical standards[3] when the Commission instituted the present proceeding on December 19, 1975, and that the FTC had not yet taken any irrevocable action in the case before the revision was completed. (The ALJ's Initial Decision did not issue until November 13, 1978.) Moreover, although the Association's 1971 publication of *Opinions and Reports* had contained some anti–competitive features that were objectionable from an antitrust law standpoint, these provisions had not been generally enforced; indeed, they were hardly enforced at all. For these reasons I believe that the Association should be judged by its 1976 and 1977 revised principles and interpretations rather than by the earlier ones.

The effect of the revised principles and interpretations was to revoke and rescind the earlier ones. There is no evidence from which it might reasonably be inferred that the Association, its affiliates and members would not adhere to the revised principles in lieu of the earlier ones. In my view the 1976 principles as interpreted in 1977 substantially comply with antitrust requirements and overrule those prior interpretations which might have offended the Sherman Act. The new *Opinions and Reports* states that dissemination of non–deceptive information, including fee information, is ethical. "Solicitation," which is narrowly defined to cover only certain deceptive pro-

---

**3.** The Administrative Law Judge's decision states (at p. 227):

"The proposal for a new 'updated' edition of the 1971 *Opinions and Reports* was formally

sanctioned at a meeting of the Judicial Council in November 1975 (Tr. 4336; RX 621)."

motional devices which clearly have a significant capacity to mislead (e. g., claims intended or likely to create inflated or unjustified expectations of favorable results, self–laudatory statements implying that a physician has superior skills, and other factual misrepresentations) is properly condemned as unethical. Such restraints hardly suppress competition. See *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *Semler v. Board of Dental Examiners*, 294 U.S. 608, 612, 55 S.Ct. 570, 572, 79 L.Ed. 1086 (1935).

Advertising by doctors of fee information is permitted, and useful information may be published in "office signs, professional cards, dignified announcements, telephone directory listings and reputable directories." Physicians may ethically be employed on a contract basis, provided they "should not be subjected to lay interference on professional matters and that their primary responsibility should be to the patients they serve." This reasonable provision eliminates the earlier restrictions on contractual arrangements found in the 1971 *Opinions and Reports* and the 1974 Report on *Physician Hospital Relations.*

In short, a review of the 1977 *Opinions and Reports*, considered in the light of the other record evidence, demonstrates that the Association, long prior to any order in this case, had changed its ethical standards to insure reasonable compliance with the law and at the same time properly to "discourage abusive practices that exploit patients and the public and interfere with freedom in making an informed choice of physician and free competition among physicians." (AMA Statement of April 9, 1976.) It is significant that in *Bates v. State Bar of Arizona*, 433 U.S. 350, 369 n.20, 97 S.Ct. 2691, 2701, 53 L.Ed.2d 810 (1977), the Supreme Court cited with approval the Association's revised standards, stating:

"Indeed, it appears that even the medical profession now views the alleged adverse effect of advertising in a somewhat dif-

ferent light from the appellee. A Statement of the Judicial Council of the American Medical Association provides in part:

" 'Advertising–The *Principles [of Medical Ethics]* do not proscribe advertising; they proscribe the solicitation of patients. . . . The public is entitled to know the names of physicians, the type of their practices, the location of their offices, their office hours, and other useful information that will enable people to make a more informed choice of physician.

" 'The physician may furnish this information through the accepted local media of advertising or communication, which are open to all physicians on like conditions. Office signs, professional cards, dignified announcements, telephone directory listings, and reputable directories are examples of acceptable media for making information available to the public.

" 'A physician may give biographical and other relevant data for listing in a reputable directory. . . . If the physician, at his option, chooses to supply fee information, the published data may include his charge for a standard office visit or his fee or range of fees for specific types of services, provided disclosure is made of the variable and other pertinent factors affecting the amount of the fee specified. The published data may include other relevant facts about the physician, but false, misleading, or deceptive statements or claims should be avoided.' 235 J.A.M.A. 2328 (1976)."

Any possible lingering doubt about the Association's independent voluntary compliance with the law is dispelled by the adoption by its House of Delegates on July 22, 1980, of new *"Principles of Medical Ethics"* which completely eliminate the controversial former provisions attacked by the FTC despite their reasonableness as construed by the Association's *Opinions and Reports.* The new ethics code, a copy of which is printed in the margin,[4] omits Sec-

---

4. The new Principles of Medical Ethics adopted by the Association on July 22, 1980, provide:

"PREAMBLE

"The medical profession has long subscribed to a body of ethical statements devel-

tion 5 of the former *Principles of Ethics* which provided that a physician "should not solicit patients" and Section 6, which specified that "A physician should not dispose of his services under terms or conditions which tend to interfere with or impair the free and complete exercise of his medical judgment and skill or tend to cause a deterioration of the quality of medical care." Thus the Commission's order deals with practices that are now ancient history rather than with the facts as they now exist. Instead of facing reality it has set up the equivalent of a "straw man" to accommodate its desire to regulate the Association.

The burden is on the Commission to show that injunctive relief is warranted, *SCM Corporation v. FTC*, 565 F.2d 807, 812 (2d Cir. 1977), and that there is "positive proof of a reasonable likelihood that past wrong–doing will recur." *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977); *SEC v. Commonwealth Chemical Securities Inc.*, 574 F.2d 90, 99 (2d Cir. 1978); *SCM Corporation v. FTC, supra.* The relevant proof, which in my view consists of the Association's post–*Goldfarb* activities, does not provide substantial evidence supporting a finding of liability. Moreover, since there is no evidence of likelihood that pre–*Goldfarb* activity will recur, the Commission's order in my view constitutes an abuse of discretion.

For these reasons I would deny enforcement.

oped primarily for the benefit of the patient. As a member of this profession, a physician must recognize responsibility not only to patients, but also to society, to other health professionals, and to self. The following Principles adopted by the American Medical Association are not laws, but standards of conduct which define the essentials of honorable behavior for the physician.

"A physician shall be dedicated to providing competent medical service with compassion and respect for human dignity.

"A physician shall deal honestly with patients and colleagues, and strive to expose those physicians deficient in character or competence, or who engage in fraud or deception.

"A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient.

"A physician shall respect the rights of patients, of colleagues, and of other health professionals, and shall safeguard patient confidences within the constraints of the law.

"A physician shall continue to study, apply and advance scientific knowledge, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.

"A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical services.

"A physician shall recognize a responsibility to participate in activities contributing to an improved community."